## SANDY BAYOU MANDAMUS CASE.

STATE OF MISSISSIPPI, EX REL. J. B. GREAVES, DISTRICT ATTORNEY, *v.* JOHN J. HENRY, WARDEN OF THE PENITENTIARY.

[40 South. Rep., 152.]

1. CONSTITUTIONAL LAW. *Construction. Statutes. Rules.*

The following rules for determining the constitutionality of statutes and construing them announced:

(*a*) If there be a well-founded reasonable doubt of the constitutionality of a statute, it should be held valid.

(*b*) A state statute the language of which is plain must be enforced as written, regardless of the evil to which it may lead,

since the legislature has all power not denied to it by the constitution, state or national.

(c) Where the constitution deals with a subject its provisions cannot be enlarged or restricted by legislative énactment, in the absence of constitutional warrant for so doing.

(d) Where the constitution enumerates power granted or denied, it must be held to have named all of the powers so dealt with and as being, with the necessary implications, the sole limit of authority or restriction.

(e) Contemporaneous and antecedent history and subsequent action by the departments of the government may be looked to in order to ascertain the meaning and force of terms and the real intent of the legislature in the adoption of a statute of doubtful meaning, but they cannot control the interpretation of a statute the language and meaning of. which is plain.

(f) A new constitution deprives the legislature of power previously possessed only to the extent of the restrictions therein contained.

2. SAME.   *Judicial powers.   Encroachment on executive.*

The action of the board of control of the penitentiary touching the working of convicts, so far as it is within the scope of its authority under a valid statute, in the absence of corruption or official misconduct, is not reviewable by the courts.*

3. SAME.   *Code* 1892, § 3201.   *Constitution* 1890, *secs.* 223, 224.

Code 1892, § 3201, providing for working convicts on a farm leased for that purpose, is not violative of Constitution 1890, secs. 223, 224, prohibiting the leasing or hiring of convicts to any person, firm, or corporation, except under state supervision, on certain public works.

4. STATUTES.   *Repeal.   Code* 1892, § 3201.   *Laws* 1894, *ch.* 75, *p.* 65.

Code 1892, § 3201, providing for working convicts on a farm leased for that purpose, is not repealed by Laws 1894, ch. 75, p. 65. providing for the establishment of a penitentiary farm, but authorizing the board of control, if the convicts cannot be profitably worked on the land, to employ them in the manner deemed most advisable.

---

*Justices Truly and Calhoon concurred in the proposition as stated, but the latter did not think the courts would have power in the premises even were corruption and official misconduct charged.

5. SAME. *Laws 1900, ch. 56, p. 63. Laws 1902, ch. 57, p. 54.*

Laws 1900, ch. 56, p. 63, providing for the preparation and occupancy by convicts of lands acquired by the board of control of the penitentiary and that no previous contract for the leasing of lands for working convicts shall be impaired by the provisions of the act, does not repeal Code 1892, § 3201, authorizing such leasing, especially in view of Laws 1902, ch. 57, p. 54, recognizing leases then existing and dealing with the money to accrue in the future from that source.

6. CONSTITUTION 1890, SECS. 223–226. *Convicts. Use of farms.*

Constitution 1890, secs. 223–226, relative to the penitentiary and prisons, forbidding the leasing or hiring of convicts, authorizing the employment of convicts on public works, and providing that the legislature "may place the convicts on a state farm or farms and have them worked thereon under state supervision exclusively, . . . and may buy farms for that purpose," and the penitentiary ordinance adopted by the convention on November 1, 1890, which provided for the appointment of a commission to report to the next session of the legislature on the advisability of establishing a penitentiary farm, do not require that the convicts shall be placed on a state farm, nor the purchase of a farm for that purpose, and they may be worked on lands leased by the state for that purpose.

7. SAME. *Leasing a farm. Hiring convicts.*

A contract between the board of control and the owner of a plantation, by which the board agrees to work the plantation by convict labor and to pay the owner all the crops grown thereon after the sum of twenty-five thousand dollars has been realized therefrom, and the owner guarantees that the crops shall amount in value to twenty-five thousand dollars, and which provides that the board of control shall have absolute authority over the labor and that the owner shall furnish teams and farm implements for working the plantation, constitutes a leasing of lands, and not a hiring of convicts, within the meaning of Constitution 1890, sec. 223, forbidding the hiring of convicts to individuals, private parties, or corporations.

8. SAME. *Convict labor. Regulations. Board of control. Powers of, etc.*

Under Laws 1894, ch. 75, sec. 3, p. 66, providing for the purchase of land for penitentiary farms and authorizing the board of control to remove convicts to such land and to work the convicts there, or in other ways deemed most advisable, and

Laws 1900, ch. 56, sec. 2, p. 64, providing for the purchase of additional lands for a penitentiary farm and authorizing the board of control to occupy such lands as soon as practicable with as many convicts as may be necessary to manage the same, and Laws 1902, ch. 57, sec. 1, p. 54, providing for the disposal of the products of state farms or farms worked on the lease system, the board of control is vested with a discretion in the management of convicts and penitentiary farms which cannot be controlled by the courts, and it is for the board to determine whether a certain course is practicable, profitable, or necessary.

9. PLEADING. *Conclusions of pleader.*

Averments of a petition for a writ of mandamus to compel the warden of the penitentiary to remove convicts from a leased farm and to place them on a farm owned by the state, to the effect that the board of control is not having timbered land opened as "rapidly as practicable," and that all the convicts can "easily and profitably be employed," are not statements of facts, but mere conclusions of the pleader.

FROM the circuit court of, first district, Hinds county.

HON. DAVID M. MILLER, Judge.

The state of Mississippi, suing upon the relation of J. B. Greaves, district attorney, appellant, was plaintiff in the court below; Henry, warden of the penitentiary, appellee, was defendant there. The court below sustained the defendant's demurrer to plaintiff's petition for a mandamus and dismissed the suit, and plaintiff appealed to the supreme court.

The object of the suit was to compel the warden of the penitentiary to remove all state convicts from Sandy Bayou, a plantation leased by the state from Horace J. McLaurin, and to place and keep them on a farm owned by the state. This suit was begun after, and in consequence of, the dissolution of the preliminary injunction issued in the suit of *The State on the relation of James K. Vardaman, Governor,* v. *Henry, Warden of the Penitentiary, et al.,* and which injunction was dissolved by the supreme court. See *Henry, Warden, et al.,* v. *State, ante,* 1 (s.c., 39 South Rep., 856). The averments of

the bill in equity in the first case were practically the same as those of the petition in this case.

Counsel requested the court to pass upon the following questions.: First—Is the board of control beyond the power of the courts in respect to the subject-matter of the contract in question? Second—Has the board of control the power to work convicts on leased lands, and is the contract in question one of leasing of land or one of hiring of convicts? Third—The contract being already made, is it valid under the averments of the petition? The facts are otherwise fully stated in the opinions.

*J. A. P. Campbell,* for appellant.

Convicts are, under the constitution, permitted to be worked on public roads or other public works, or public levees, or tilling the soil on state farms, or manufacturing. This is exclusive of every other disposition of them. The legislature may place them on state farms, not on private farms. They may be employed, under state supervision and the officers and employes of the state, on public works, or public levees, or on state farms, but never on a private farm. The language of the constitution and all its implications plainly mean that, and nothing else.

The penitentiary ordinance of the convention did not change the constitution in any respect. It was to further its purpose and aid in effectuating it. To hold otherwise would impute folly to the convention. The constitution was framed for permanency. The ordinance was to aid in carrying it into effect as to state farms. It must be so interpreted, and not as modifying any of the specific provisions of art. 10. The expression, "or some other system," in the ordinance, means something within the terms of the constitution—as, for instance, manufacturing instead of farming, or working on public roads or other public works, or on public levees. It certainly did

not mean to undo what the convention had done by the emphatic language of art. 10.

The constitution plainly forbids the working of convicts anywhere except in the penitentiary, as it existed and was known to the convention, or out of it on public roads or other public works, or public levees, or state farms. Its prohibitions and permissions are limited to these and exclude employment on any private farm. No ingenuity can torture the language of art. 10 so as to permit employment of convicts elsewhere than as stated, without shocking every logical mind, as it seems to us.

Grant that the constitution is permissive to the legislature as to the establishment of state farms, it is indisputable that its prohibitions and permissions to the legislature must govern it. It must be true that no convict can ever be leased or hired or worked anywhere except on public roads or other public works, or on public levees, or on a state farm, or at manufacturing. The penitentiary at Jackson was known to the convention. It refused to dispose of it. It contemplated its continuance as a home for convicts from which they could be sent forth for work on authorized public works unless farms were provided to take its place.

Laws 1900, p. 63, provides for the purchase of another farm or farms, and that, "when purchased, they shall be occupied as soon as practicable with as many convicts as may be necessary to occupy and manage the same" (as soon as practicable, in fact, and not as the board of control may determine) ; "shall at once take such steps as may be necessary to properly prepare said land for the use and occupation of convicts ;" "when so occupied shall be cultivated and shall be opened up for cultivation as rapidly as practicable" (showing that the fact that not land enough is open for cultivation by all is no ground for keeping convicts elsewhere, and that it was to be occupied by them and prepared for cultivation as rapidly as practicable).

Of course the convicts might be placed on any state farm, but not on a private one for any purpose.

Contemporaneous construction and official action and legislation and codification by eminent lawyers, who were members of the convention, go for nothing in the face of plain provisions of the constitution.

It will not do to permit the constitution to be violated because of the action of legislatures or eminent lawyers or governors, auditors, or other officials. Many instances of erroneous action by legislatures, officials, and even courts, may be cited, which this court corrected after years. The clause of sec. 3201 of the code, which authorizes leasing farms, is violative of the constitution, and all leasing void; and, tried by the act of 1900, as well as the constitution, placing convicts on any farm except a state farm is unauthorized and prohibited. It matters not what the contract may be, none but a state farm can be the place for employment of convicts, if the constitution is to govern.

*J. B. Greaves,* district attorney; *Alexander & Alexander,* and *George B. Power,* on the same side.

A lease is defined to be "a contract for the possession and profits of lands and tenements, on the one side, and the recompense of rent or property, on the other; or, in other words, a conveyance to a person for life, years, or at will, in consideration of a return of rent or other recompense." 18 Am. & Eng. Ency. Law, 597.

What is a hiring? It is defined to be "a contract by which the use of a thing or labor or services about it are stipulated to be given for a reasonable compensation expressed or implied." 2 Kent's Com., 585; 7 Am. & Eng. Ency. Law, 300.

It would seem that a glance at the resolution of the board in the light of these definitions would be sufficient to show its true character. The contract, looking to its language, is "that the board of control will work with the convicts for the year 1906

Sandy Bayou plantation." This is also the language of the contract. To recur to the definition, the contract is one by which the labor or services of seventy convicts are stipulated to be given about a certain plantation. If we omit the word "leased" in the fourth section of the contract, where it is stated, "in addition to the land leased and furnished" by Mc-Laurin, there is not one clear earmark of a lease in this contract. It is well settled that the use of the word "rent" or "lease" is not controlling as to the character of the contract. 1 Wash., Real Property, 365, 605.

Where there is a division of crops between the owner and the cultivator of land, uncertain in amount, or where there is no clear demise, or where there is no exclusive occupation agreed upon, but services to be paid for in part of the crops, the occupant is not even a tenant in common, but merely a cropper. Taylor, Landlord & Tenant, sec. 24a and note.

Joint occupancy, or occupancy on shares, is not a tenancy. Where landowner contracts with one to crop his land and to give him a part of the crop after paying all advances, the latter is a mere employe. Taylor, Landlord & Tenant, 24.

A tenant to be such must have an interest in or possession of the premises. *Moser* v. *Lower,* 48 Mo. App., 85; *Alwood* v. *Ruckman,* 21 Ill., 200.

The cases of *Schlicht* v. *Callicott,* 76 Miss., 487 (s.c., 24 South. Rep., 869), and *Alexander* v. *Zeigler,* 84 Miss., 560 (s.c., 36 South. Rep., 536), are at first glance in seeming conflict with several previous Mississippi cases and with almost universal current of authorities of other states, but when these two cases are examined it will be seen that they do not in any way involve the distinction between a contract of tenancy and a contract of hiring.

In order to constitute a lease the occupant must have an interest in the soil. 1 Wash., Real Property, 365, 496; 1 Hill, Real Estate, ch. 16, sec. 24; 7 N. W. (Minn.), 142.

"If the agreement amounts only to an agreement on the part of the one who is to do the labor, to take charge of and manage the land on shares, it is not regarded as a lease, but more in the nature of payment of services rendered by the crop raised." 1 Wash., Real Property, 365, 604. "Where the owner of the farm was to furnish teams and fodder for them, seed and farming implements, and the other party to do the work, cultivate and secure the crops, and these were to be divided between them in certain shares, or proportions, it was held to constitute a tenancy in common of the crops, not a demise of the premises." 1 Wash., Real Property, 365, 605. To the same effect, see 18 Am. & Eng. Ency. Law, 173.

*Frank Johnston,* also on same side.

That the courts may prevent the execution of illegal acts and contracts of municipal boards, and boards of a similar character, is a doctrine of law that is well settled by the great weight of authority. While these boards cannot be supervised by the courts and their discretionary powers invaded, yet the rule is firmly established that after they have acted, the courts can restrain their agents and officers from carrying their illegal acts into effect.

This board cannot be restrained from making an illegal contract or making illegal orders, yet when it makes a contract which is without authority and is unlawful, the court can prevent its performance.

Judge Dillon says, of the action of mandamus, that "the right to the writ and the power to issue it has ceased to depend upon any prerogative of power, and is now regarded as an ordinary process in cases to which it is applicable. It is a writ to which every one is entitled when it is the appropriate process for asserting the right he claims." 2 Dill., Mun. Corp., sec. 825 (4th ed.).

This is the language of Chief Justice Taney in *Kentucky v. Dennison, Governor,* 24 How. (U. S.), 66, 67, 68.

This action is made very comprehensive by the statute of the state. Code 1892, § 2846.

The writ is either mandatory or restraining, as the circumstances of the case may require. It commands the defendant to do or not to do an act, according to the facts in the case.

The writ will lie against the secretary of state to compel the performance of a ministerial act. *State* v. *Secretary of State,* 33 Mo., 293. It will run against a state treasurer. *R. R. Co. ex parte,* 46 Ala., 423; *State* v. *Bordelon,* 6 La. Ann., 68; *State* v. *Wickman,* 10 Mont., 497. And against the comptroller of a state. *Fowler* v. *Pierce,* 2 Cal., 165. And against a state auditor. *State* v. *Warner,* 55 Wis., 271. Also against a land commissioner. *Webster* v. *Newell,* 66 Mich., 503.

It is uniformly held that the writ of mandamus will issue to public officers, public boards, and public corporations, and all others exercising public authority, to compel the performance of official acts that pertain to their duty and are of absolute obligation. Merrill on Mandamus, 130.

In support of this proposition among many decisions, I will refer to the following cases: *Asberry* v. *Beavers,* 6 Tex., 457; *People* v. *Inspector of State Prisons,* 4 Mich., 187; *People* v. *State Treasurer,* 24 Mich., 468; *Runion* v. *Letimore,* 6 S. C., 126.

The writ of mandamus operates as a restraining or mandatory process, and in its operation has precisely the effect of an injunction in equity. In some cases mandamus and injunction are correlative to each other. *Board of Liquidation* v. *McComb,* 92 U. S., 531, 541.

The warden of the penitentiary is a public official with ministerial authority. He is now performing a contract under the directions of the board of control, by working a number of the state's convicts on H. J. McLaurin's plantation, in Sharkey county, which contract of the board is in violation of the constitution of the state.

It is sought by this mandamus proceeding to compel the warden to place these convicts on the state farm, where they rightfully belong.

The only authority claimed by the warden for keeping the convicts on the plantation of McLaurin is this action of the board of control.

Thus the question of the validity of the contract is directly presented for decision.

*McWillie & Thompson,* for appellee.

First—The board of control is given full jurisdiction of the management of the penitentiary and convicts. Code 1892, § 3172. It is empowered to lease farms. Code 1892, § 3201.

Second—These code sections are not violative of any provision of the constitution. See Constitution 1890, art. 10, secs. 223-226.

Third—Nor are they repealed by any subsequent legislation. Laws 1894, p. 65, sec. 5; Laws 1900, p. 63; Sedgwick on Stat. & Const. Law, p. 123; Sutherland on Stat. Const., secs. 137, 138. Right to lease recognized. Laws 1902, p. 54.

Fourth—The duties of the board of control are executive, and involve the exercise of discretion. They are not merely ministerial. *Mississippi* v. *Johnson,* 4 Wall. (U. S.), 498; *Swan* v. *Grey,* 44 Miss., 393; *Decatur* v. *Paulding,* 14 Pet. (U. S.), 497; *Flournoy* v. *Jeffersonville,* 17 Ind., 169 (s.c., 79 Am. Dec., 468 and note).

Fifth—It is a general rule that the courts will not, by mandamus or injunction (correlatives in many particulars), control the action of executive offivers. Some courts draw a distinction between acts involving discretion and ministerial acts, but our supreme court refused to recognize the distinction, flatly refusing a mandamus to compel the governor to perform even a ministerial act. *Vicksburg, etc., R. Co.* v. *Lowry,* 61 Miss., 102.

*Mandamus Refused.—Board of Direction, etc.,* v. *Wolfley* (Ariz.), 22 Pac. Rep., 383—governor; *People* v. *Russell,* 19 Ill., 229 (s.c., 68 Am. Dec., 591)—governor; *People* v. *Governor,* 29 Mich., 89 (s.c., 18 Am. St. Rep., 89)—governor; *Rice* v. *Austin,* 19 Minn., 103 (s.c., 18 Am. St. Rep., 330)—governor; *Murran* v. *Smith,* 8 R. I., 192 (s.c., 5 Am. St. Rep., 564)—governor; *Jonesboro, etc., Co.* v. *Brown* (Tenn.), 8 Bax., 490 (s.c., 35 Am. St. Rep., 713)—governor; *State* v. *Stone,* 120 Mo., 428 (s.c., 41 Am. St. Rep., 705; 23 L. R. A., 195, and cases cited)—governor; *State ex rel.* v. *McMillan* (S. C.), 29 S. E. Rep., 540—commissioner; *Bates* v. *Taylor* (Tenn.), 3 L. R. A., 316—governor.

*Injunctions Denied.—Mississippi* v. *Johnson,* 4 Wall., 475—president; *Gaines* v. *Thompson,* 7 Wall., 347—secretary of the interior and land office commissioner; *Litchfield* v. *Register,* 9 Wall., 577—register and receiver land office; *Land* v. *Anderson,* 67 Fed. Rep., 563—commissioners for Indian lands; *Enterprise, etc., Ass'n* v. *Zumstein,* 64 Fed. Rep., 837 (s.c., 67 Fed. Rep., 1000)—postmaster; *Koehler* v. *Barin,* 25 Fed Rep., 167—register and receiver of land office; *New Orleans* v. *Paine,* 147 U. S., 261—deputy surveyor general of United States; *Oregon* v. *Pennoyer,* 25 L. R. A., 862 (s.c., 31 L. R. A., 473)—commissioners for locating asylum; *Green* v. *Mills,* 30 L. R. A., 90—registers of voters; *Taylor* v. *Kercheval,* 82 Fed. Rep., 497—United States marshal; *South Dakota* v. *Thoroon* (S. D.), 33 L. R. A., 582—secretary of state; *American School of Magnetic Healing* v. *McAnnulby,* 102 Fed. Rep., 565—postmaster; *Frost* v. *Thomas,* 26 Col., 222 (s.c., 77 Am. St. Rep., 259)—governor; *Coleman* v. *Glenn,* 103 Ga., 458 (s.c., 68 Am. St. Rep., 108)—school commissioners.

Sixth—A few American courts will control, by mandamus or injunction, official acts which are wholly ministerial; but in such cases the complainant must show a personal injury. *Board of Liquidation* v. *McComb,* 92 U. S., 531; *Noble* v. *Union*

*River Logging R. Co.,* 147 U. S., 165; *Taylor* v. *Kercheval,* 82 Fed Rep., 499; *Green* v. *Gibbs,* 54 Miss., 592.

Seventh—The state has no greater rights than an individual litigant. *Oregon* v. *Taylor,* 31 L. R. A., 473.

Eighth—The majority of the board of control is the board. *State* v. *McMillan* (S. C.), 29 S. E., 540.

Ninth—The board of control is composed of state officers charged with important public duties, and to put them under constraint, in respect to such duties, must bring about intolerable confusion. If, in their view of the duties of their positions, they determine to withstand the authority of the court, the only method of coercing them is by imprisonment, on which attend the same kind of objections involved in the imprisonment of the governor. Moreover, a suit against the board would be, in effect, a suit against the state, which cannot be sued except on claims which can be audited and for which the auditor has refused to issue his warrant. Code 1892, § 4248.

In a suit against penitentiary commissioners to compel the performance of a contract which they had made, it has been held that mandamus did not lie because the suit was virtually one against the state, which was, by law, exempted from suit. *People* v. *Dulaney,* 96 Ill., 500.

It is immaterial whether the proceeding be one to compel the violation or the performance of a contract, for the principle involved is the same in either case. *League* v. *De Young,* 2 Tex., 497; *Mississippi* v. *Durham,* 4 Mackey (D. C.), 235.

Two things quite clearly appear from the terms of the contract. One is that the board was to get "the use" of McLaurin's plantation for the year 1906; the other, that they were to "pay" therefor a consideration sufficiently valuable to secure McLaurin's assent to the proposition. The getting of the use for a term involves the profits accruing during the term, or such part of them as might be determined by the stipulations

of the contract. Certainly, by the terms of the contract, McLaurin was to part with the possession of his plantation for one year, and the board was to have possession of it for the same period, upon definite terms as to his compensation. The property, moreover, is referred to in the contract as the land "leased and furnished" by McLaurin.

What is a lease? We find the following to be the accepted definition: "A lease is a contract between lessor and lessee, for the possession and profits of land, etc., on the one side, and a recompense by rent or other consideration, on the other." 5 Bacon's Abridgment, 433; Shep., Touch., 265, 266; Plowden, 421, 432; 2 Greenleaf's Cruise, 373; 4 Ballard's Law of Real Property, sec. 430; *Allen* v. *Lambden,* 2 Md., 279; *Waller* v. *Morgan,* 57 Ky., 136 (18 B. Mon.); *Moshier* v. *Reding,* 12 Me., 478 (3 Fairf.); *Jackson* v. *Harsen,* 17 Am. Dec., 520 (note).

The books are full of cases in which contracts have been recognized as leases that provided for another form of recompense than that of a money rent. No particular form of expression is necessary to create a lease, though the use of that term in the instrument is not without weight. The essential characteristic of a lease is the yielding up of his property by the lessor to the lessee for a term in consideration of some recompense. As the old writers express it, "a lease doth signify a demise or letting of land, etc., unto another for a lesser time than he that doth let hath in it."

It does not, in the slightest degree, affect the relation of the parties to the contract, as landlord and tenant, that this recompense may take the form of a part of the crop, nor that the landlord may furnish work teams, etc. This has been settled by two decisions of our own supreme court, which are as good law now as when they were rendered. *Schlicht* v. *Callicott,* 76 Miss., 487, 492 (24 South. Rep., 869); *Alexander* v. *Zeigler,* 84 Miss., 560 (36 South. Rep., 536).

Even where certain courts have regarded a transaction as

otherwise indicating a cropping on shares rather than a leasing, they give great importance to the manner in which the crops are to be divided, and hold that the fact that they are to be divided by the occupant, and not the landowner, is of controlling weight in determining the relation of the parties to be that of landlord and tenant. *Symonds* v. *Hall*, 37 Me., 354 (s.c., 59 Am. Dec., 53) ; *Barry* v. *Smith*, 1 Misc. (N. Y.), 240; *Rinehart* v. *Olivine*, 5 Watts & S. (Pa.), 157; *Ream* v. *Harnish*, 45 Pa. St., 379.

In the case at bar the board was to harvest all of the crops, and after taking out $25,000 worth for its share, was to turn the balance over to McLaurin.

If we turn to the view expressed by the chancellor, that the contract is one which provides for a hiring of the convicts, we are at once confronted by a most remarkable absence of those features which alone could justify such a conclusion. It will be observed that the board decided to work the convicts itself on McLaurin's land, not to hire the convicts to him to be worked on it; that for this purpose the board was to get the use of McLaurin's land; and that while so engaged in working "the land leased and furnished" by McLaurin, the board was to have absolute control and authority over the labor; and direct it to suit itself. As in a lease the yielding up of the lessor's land for a recompense is the distinguishing characteristic, so in a hiring—whether of things, animals, or men—the exclusive use, and the exercise of control and direction for a consideration, is the essential characteristic. The idea of hiring that which all the time remains in the exclusive use, or in the service and under the exclusive direction and control, of the hirer, is an anomaly entirely outside of law and the domain of rational thought. In all cases of a hiring there is a bailment, and it would be interesting to have pointed out those characteristics of a bailee which attach to McLaurin in this transaction. There is no safer method of classifying a transaction than to do so

on the incidents that attend its operation; "by their fruits ye shall know them." In the case of trespass by a third person during the year 1906, could not the board, having possession for that year and vested with the right to cultivate and harvest the crops for a share of the same, maintain an action for damages? Could it not do this under the contract, and could it do so if it had merely hired the convicts to McLaurin? 18 Am. & Eng. Ency. Law, 453.

McLaurin, though owner, could not even have maintained unlawful detainer, during the term, against a stranger intruding upon the land. *Hummell* v. *Atkinson,* 82 Miss., 465.

The chancellor based his view of the contract upon a strange misconception of its nature.

*Williamson, Wells & Peyton,* on the same side.

It is well settled, by no less an authority than the supreme court of the United States, that in a case involving numerous questions of law and fact, and where many acts of the parties connected with it may be valid or void, depending upon circumstances and facts attending them at the time, and which rest in parol proof, a mandamus is not the proper remedy to be applied, particularly while it is reasonable to assume that parties are interested who should have an opportunity to defend their rights. 72 U. S. (5 Wall.), 563.

Mandamus will be denied, although the relator may have a clear legal right thereto, if its effect will be to decide, in a collateral way, questions of importance between persons who are parties to the proceedings and who have no notice or opportunity to interpose their defenses, and great hardship will result to them from the enforcement of the writ. *Ex parte DuBose,* 54 Ala., 278.

The case presented by the petition in the instant case involves numerous questions, both of law and fact. It involves the construction of the sections of the constitution relating to the penitentiary; it involves the constitutionality of sec. 3201

of the annotated code; it involves a construction of the act of the legislature of 1894; it involves a decision of the question as to whether or not the board of control had the legal right to make a lease contract, as was made in this case; it also involves the decision of many questions of fact which rest in parol proof. And the petition shows on its face that the parties who made the contract, and who are interested in it, and who should have an opportunity to defend their rights, are not parties to the proceeding, and are not given any notice or opportunity to defend.

One of the judges of this court has already decided that the board of control of the penitentiary had the legal right to make the contract which is herein assailed; that sec. 3201 of the annotated code, which is here assailed, is a valid and constitutional law, and that it has not been repealed; that the contract herein assailed as a lease of the convicts is, in truth and fact, a lawful lease of land; that the board of control of the state penitentiary, in the making of the said contract, acted within the scope of their authority and in a perfectly lawful manner. And still in this action it is sought to set the contract aside as invalid, unlawful, and void, and that, too, in a proceeding wherein none of the parties to the contract whose rights would be most seriously affected are made parties or given opportunity to be heard in defense of their rights. A mere statement of such an unjust proceeding, it seems, should be sufficient to show that it cannot lawfully be maintained.

The warden of the penitentiary is not an "officer" upon whom the responsibility of disposing of the convicts rests, any more than are the treasurer, clerk, physician, sergeant of the guard, dispatch sergeant, and other under officers. All of them are mere employes of the board of control, and all of them are subject to the directions and control of that responsible body, to whom has been committed the entire matter of the management and control of the convicts.

It would seem to be an anomalous proceeding to issue a writ

of mandamus directing the warden to do an act which he cannot do without the sanction, direction, and consent of the board of control, and to require him to perform some act which is in direct violation of his instructions from his superiors, when the law does not require him to do the act required, or to do any act except under the directions of the board of control.

There is no provision of law which requires the warden of the penitentiary to keep and maintain all of the convicts on the state farm or farms, or to do any act which is a violation of the regulations and directions of the board of control.

It is sought by this petition for a writ of mandamus against the warden of the penitentiary, to declare a contract void in the making of which the warden had no part—a contract which is made a part of the petition, and which shows, on its face, that it was entered into by the board of control and H. J. McLaurin, a private citizen, neither of whom is joined in the action in any way and neither of whom has had any opportunity to appear and defend its or his rights under the contract.

It is sought to declare a contract void either for illegality or fraud, without having the contracting parties before the court. Not only so, but the nature of the contract is the same as similar contracts which have been made by the same parties for a long period of time, the legality and validity of which have never before been brought into question.

Surely if such a contract is to be canceled and held for naught, it should be done in some proceeding to which the parties to the contract are made parties; and if the validity of the contract is to be determined on the truth of allegations which amount to illegality and fraud, the parties against whom these derelictions are charged ought, in common justice, to have an opportunity to refute the charges of fraud and to defend their rights under the contract. Not to permit them so to do would be a perversion of common justice and a violation of all rules of right thinking.

Argued orally by *J. A. P. Campbell, Frank Johnston,* and *C. H. Alexander,* for appellant.

[Counsel for appellee, having argued orally the questions involved on the hearing of the injunction case—*Henry* v. *State, ante,* 1—declined to make further oral argument.]

CALHOON, J., delivered the opinion of the court.

Had the board of control of the state penitentiary the power, under the constitution, to work convicts on leased lands? This is the chief question in the agreement of counsel on both sides in their request for adjudication. If the legislature had such power, the board, which it created, has it; otherwise, not. So the real question is, Did the legislature have it? Before proceeding to the examination of this subject, it. is proper to say that the writer is in full accord with the reasoning and conclusions in the concurring opinion of Justice Truly in the case of *Henry et al.* v. *State* (decided January 22, 1906), *ante,* 1—(39 South. Rep., 856), on that and all other matters it discusses except one. I do not agree with him in the doubt expressed in it that any officer or person can use the name of the state in the institution of legal proceedings without express warrant of the constitution or laws, or necessary implication from them, even if corruption be charged. My agreement with that concurrent opinion on the other matters lessens investigation now; in fact, I might rest on it if I did not feel impelled to make some additional observations pertinent to the inquiry.

In solving the question first to be considered, the interpreter of the language used must carry along with him the elementary principle that, if there be a well-founded, reasonable doubt of the constitutionality of a legislative act, it must be held constitutional. This is a well-recognized rule of the courts, ever vigilant, as they should be, of the rights and prerogatives of each branch of the governmental body politic. This rule is based on common sense. Each branch represents the people.

Each branch, legislative, executive, or judicial, is the people, by the intendment of the organic law, in its proper sphere, and must be presumed to act within its powers under the constitution, unless the contrary plainly appears. To the courts only is the authority given to determine this, and great caution should be, and always is, exercised by them in such delicate inquiries. Otherwise, instead of being the final refuge of liberty, they would be its grave. Loose construction would eventually mean ruin. Another principle to be carried along is that, if the language be plain, the announcement must enforce it, to whatever evil it may apparently lead; and a state legislature is an absolute despot, its acts on all subjects being free from any restriction whatever not found in the state or federal constitution. Congress has no power not confided to it. A legislature has all power not withheld from it. Another principle is that, where the constitution deals with a subject, its words must be the sole boundary, and sacred from the legislatures, except where it permits expressly or by necessary implication. Another is that, where the constitution schedules powers, giving or taking away, it must be presumed to have scheduled all, and it only must be looked to, with its necessary implications, for the limit of authority or restriction. Still another is that, where the language is plain, subsequent action by the departments, or contemporaneous or antecedent history of the subject, cannot be appealed to for interpretation; but these may all be delved into to ascertain the meaning and force of terms or words—the real intent, from the language, being the very thing at last to be ascertained. Lastly, where the legislature had powers precedent to the constitution, it will continue to enjoy them to the full extent as before, up to the point of restriction by that instrument.

It is certain that the courts should not lightly declare void the leasing system, which for twelve years had netted the state an enormous sum of money and saved it an enormous loss

monthly in outlay which would have been necessitated without it. It is of the highest importance to the appellant, and, in my judgment, vital to its success, that the word "may," in sec. 225 of the constitution, should be construed as "shall." Pages of argument are devoted to this. The particular words are: "The legislature may place the convicts on a state farm, or farms, and have them worked thereon, under state supervision exclusively, in tilling the soil, or manufacturing, or both, and *may buy farms for that purpose."* (The italics are ours, as they will be ours whenever used in any quotation throughout this opinion.) Very clearly, if "may" here must be read "shall," the appellee has no shadow of a case; and if the learned judge below had thought that, his judgment would have been the reverse of what it is. He did not think so. Neither do we. The constitutional convention was never guilty, in the then situation, of the grotesque absurdity of meaning, when they said "may," that the legislature *"shall"* place the convicts on a farm or farms, and *"shall buy farms for that purpose."* To any plain, sane mind this view is instantly and palpably ridiculous on the face of it. There are many scores of cases in the law books, applied to a great variety of facts, and of infinite shades of reasoning, on the subject of when "may" is mandatory and when permissive. It would take several volumes to intelligently present them; but, on a thorough churning, the cream of them is that "may" means "may," unless from the whole context the purpose plainly appears that it should be mandatory, and then, and not until then, it is construed to mean "shall." We might stop here on this branch; but to throw all the light possible on it, and, as the citations will be needed for reference in the consideration of other points made, we reproduce everything pertinent from the journal of the proceedings of the constitutional convention.

Bear in mind that the legislature had unlimited power, before the constitution, to do with the convicts as it saw fit. It

could work them in the penitentiary, or hire them to any one it pleased, or lease lands and work them on these, or buy lands and work them on those. In fact, it did not either lease or buy lands. It hired out the convicts bodily to individuals and corporations, with the result of great inhumanity—brutality, in fact, in its most hideous proportions. This system began with a leasing out of the penitentiary property, the convicts being included with the lease of the property. This gave rise to the popular confusion of terms in applying the word "lease," applicable to the penitentiary and the land it inclosed only, and the word "hire," applicable alone to the convicts. It is a fact that there never was a lease of land to work the convicts on until after the constitutional convention, thus making it certain that there never could have been any complaint of that before, and demonstrating that the words "leasing or hiring of convicts," appearing in the proceedings of that convention, refer, as they plainly do from the context, to the convicts, and not to the land.

The first appearance of the subject is on pp. 56, 57, of the journal, as follows: "Mr. Dean offered the following resolution, which was adopted: '*Resolved,* That the president of this convention appoint a committee of seven members to whom all ordinances or resolutions relating to the penitentiary or *convict-leasing system* shall be referred.' The president appointed the following on said committee, to be known as the 'committee on penitentiary:' Messrs. Dean, Featherston, Dillard, Jones, Love, Alcorn, and Sexton. Mr. Dean offered the following ordinance, which was read, ordered printed, and referred to the committee on penitentiary: '*Be it ordained by the people of the state of Mississippi in convention assembled,* That from and after the 1st day of January, A.D. 1895, the system commonly known in this state as the *"convict-leasing or hiring system"* shall be unlawful, and from and after that date the *hiring* of state convicts to individuals or corporations is

hereby prohibited and *shall forever cease.* The legislature *shall* provide, by appropriate legislation, for the abandonment of this system and practice by the above-mentioned date, or sooner if practicable.' "

It is plain that Mr. Dean's resolution and proposed ordinance had reference only to the leasing (hiring) of convicts, and not to the leasing of lands as state farms. In fact, there never had been any state farm, leased or bought, but a hiring out of convicts only, and there could never have been any complaint about leasing lands by the state. There has never been any complaint, since the constitution, of leasing land during the more than ten years the legislature has been leasing it, until within the last ninety days, and that in the chancery suit of *State* v. *Henry, Warden;* and neither in that nor in the case at bar is there, or could there be, any complaint of ill usage, or bad treatment of any sort, or any sort of evil arising out of the system. This is mentioned to show that we are invited to decide a mere dry, bare constitutional question, with no evil to remedy. In essence we are simply to say whether a leased farm may be a state farm, whether land must be bought and owned in fee simple before it can be a state farm, whether a lease for one or five hundred years would be void.

So far from there having been any condemnation of the system, it has received very high commendation by this court in *State* v. *Levee Commissioners,* 75 Miss., 136, 137 (21 South. Rep., 662), as follows: "But it may be said that when the state enters upon the business of cotton planting, its property employed in, or created by, and resulting from, such mere business employment is, as to these bondholders and the levee board, then to be regarded and treated as all other cotton raised by planters in pursuit of their vocation. The plain answer to this is that the state, in discharge of its governmental duties of looking after, caring for, and suitably employing its penitentiary convicts, has *wisely deemed it best to distribute* its

convicts and establish *penitentiary farms in several localities in* the state. These farms are *parts of the state's penitentiary system* of employing its convicts and caring for them. They are, in fact, *local and movable penitentiaries,* under the sole management and control of the state authority, and the products of these farms, thus established to promote the welfare of the convicts and to provide them with labor to which they are adapted and for which their previous training and habits of life peculiarly fit them, are parts and parcels of the property of the state, just as shoes, wagons, and furniture made by convicts are. *The prime object* of the state in maintaining a penitentiary, under whatever system adopted, is to properly guard and care for the convicts, and to *lessen the public burden of feeding, clothing, sheltering, and properly caring for them.* The raising of cotton, the making of shoes, the making of furniture, are merely incidents to the discharge of the functions of government in maintaining and managing its penitentiary." A farm leased by the state is, therefore, a "state farm," and not a "private farm." The cotton referred to was grown by the state on leased lands.

Recurring now to the journal of the constitutional convention, on pp. 671, 672, we find the constitutional clauses in point finally adopted, as follows:

*"Article X.     The Penitentiary and Prisons.*

"Section 223.     No penitentiary *convict shall ever be leased or hired to any* person or persons, or corporation, private or public or *quasi* public, or board, after December the 31st, A.D. 1894, save as authorized in the next section, nor shall any previous *lease or hiring of convicts* extend beyond that date; and the legislature *shall* abandon the system of *such leasing or hiring* as much sooner than the date mentioned as may be *consistent with the economic safety of the state.*

"Section 224. The legislature *may* authorize the employment, under state supervision and the proper officers and employes of the state, of convicts on public roads or other public works, or by any levee board on any public levees, under such provisions and restrictions as it *may* from time to time see proper to impose; but said convicts *shall* not be let or hired to any contractors under said board, nor *shall* the working of convicts on public roads, or public works, or by any levee board, ever interfere with the preparation for or the *cultivation of any crop* which it *may be* intended shall be cultivated by the said convicts, nor interfere with the good management of the state farm, nor put the state to any expense.

"Section 225. The legislature *may* place the convicts on *a state farm or farms* and have them worked thereon *under state supervision exclusively,* in tilling the soil or manufacturing, or both, and *may* buy farms for that purpose. It *may* establish a reformatory school or schools, and provide for keeping of juvenile offenders from association with hardened criminals. It *may* provide for the commutation of the sentences of convicts for good behavior, and for the constant separation of the sexes, and for the separation of the white and black convicts as far as practicable, and for religious worship for the convicts.

"Section 226. Convicts sentenced to the county jail *shall* not be hired or leased to any person or corporation, outside the county of their conviction, after the first day of January, A.D. 1893, nor for a term which shall extend beyond that date."

And on p. 692 an important ordinance, as follows:

*"Penitentiary Ordinance.*

*"Be it ordained by the people of Mississippi in convention assembled:*

"Section 1. With the view of *enabling* the legislature at its next session to have before it the necessary information upon which to act, if *it should determine to establish a penitentiary*

*farm,* it is made the duty of the governor to appoint five commissioners, who shall, prior to the next session of the legislature, carefully inspect such bodies of land as may be thought suitable for such location, and who shall make report to the governor as to the several advantages of the bodies of land inspected by them, and as to the propriety of establishing such farm or *some other system,* and as to the advantages of *each,* cost, and other proper matters, to be laid by the governor before the legislature, with such recommendation as he may see proper to make.

"Adopted by the convention November 1, 1890."

From art. 10 of the constitution it is clear that the hiring of any convict after December 31, 1894, would have been unconstitutional and void, if not as authorized in sec. 224. They have not been so hired, as we assume, unless it appears in the record before us, and this we will presently consider. It seems to us manifest, also, that there was no intention to interfere with the legislative power to lease land for penitentiary farms. The absolute denial of this right and the requirement that the convicts shall all be worked on one state farm is not to be thought of. One epidemic of cholera might destroy the whole scheme of profitable work, and sec. 225 expressly permits the placing of "the convicts on a state farm *or farms."* These farms may be bought in fee simple or for one or more years, as we confidently think. That "may" cannot be held to mean "shall" we think apparent from the whole article. To demonstrate this it is only necessary, throughout the whole four sections, to read the word "shall" wherever the word "may" appears, and see to what absurdities the reader will be conducted. That it was designed to mean "may"—that is, permissive—and not "shall," which is mandatory, is plain from the ordinance, before recited, in the use of the language *"if it should determine* to establish a penitentiary farm" and the words "and as to the propriety of establishing such farm *or farms* or some *other*

system." The legislature did establish the system of leasing, and its constitutionality has never been questioned in all these years, until two or three months ago, notwithstanding it has been under the notice of the supreme court repeatedly, and acted on by all the departments of the state government, under the administration of all the governors, attorneys-general, legislatures, boards of control, auditors, treasurers, and the whole people, without a murmur or cause for a murmur. If the word "may" be mandatory in sec. 225, then sec. 224 is annulled, because sec. 225 would read: "The legislature *shall* place the convicts on a state farm or farms and . . . *shall* buy farms for that purpose." If that be right, what becomes of the authority in sec. 224 to employ them on roads, public works, levees, etc. ? It is hardly probable that any unbiased lawyer or citizen would say, at the least, that the lease is unconstitutional beyond reasonable doubt. This is enough, but we think it clearly not in conflict with the constitution.

Another question is whether the contract before us "is one of leasing lands or one of hiring of convicts." It would be enough to express agreement with the concurrent opinion of Judge Truly mentioned above. It is full on this subject. But we prefer to set out the contract for the consideration of the reader. The board of control passed the following—viz.:

"*Resolved,* That the board of control work with the convicts, for the year 1906, Sandy Bayou plantation, owned by H. J. McLaurin, and shall receive for their share of the crop and for the labor of the convicts $25,000 (twenty-five thousand dollars), which sum the said McLaurin guarantees to the state certain and in all events for said year; the number of convicts to be employed on same to average seventy (70), if so many may be necessary to the proper cultivation and harvesting of the crop thereon."

Thereupon the contract, signed and approved by the board, was made, as follows—viz.:

"First—That the board of control has agreed to work the plantation in Sharkey county, state of Mississippi, owned by the said McLaurin, and known as 'Sandy Bayou,' for the year 1906.

"Second—That the said *board of control shall pay* to the said McLaurin, for the use of said plantation for said year, all the crops grown, raised, and gathered on said premises for said year, *after the sum of $25,000 shall have been reserved therefrom;* and the said McLaurin guarantees that the said crops raised on said premises shall amount to $25,000, and binds himself to the said board of control in that sum, promising to make up whatever the crops grown on the said premises *may fall short of that amount.*

"Third—That the said *board of control* shall have *absolute authority over the labor* employed in working said land, and that said labor shall be under *the direction of said board* and of the persons appointed by the board.

"Fourth—That the said McLaurin, in addition to the land leased and furnished by him, shall also furnish the necessary mules and teams for working of said plantation, and feed for same, and shall also furnish all wagons and farming implements and planting seed.

"Fifth—That the said board of control shall have said crops made, harvested, and gathered. This act executed in duplicate."

If the contract signed in duplicate and ratified by the formal official action of the board, thus interpreting the resolution, be not a lease of land, under the adjudications of this court, the farmers of the state are in a very uncertain situation.

On the matter of the insistence that Code 1892, § 3201, has been repealed, the writer is in full accord with Judge Truly's concurrent opinion heretofore referred to, and thinks it unnecessary to enlarge upon it. That section, in my opinion, stands unrepealed.

---

---

Two other questions are propounded by counsel—viz.: "Is the board of control beyond the power of the courts in respect to the subject-matter of the contract in question? The contract being already made, is it valid under the averments of the petition?" These questions are cognate and may be considered together. We shall answer the first, presuming, of course, that it has reference to the action of the board in the current case. If it should ever depart from the plain law—as, for instance, hire out convicts—the act would be unconstitutional and void and subject to the power of the courts. The real and only question here can be whether its action may be controlled when it is in the exercise of the discretion committed to it by the legislature. Answering this, we say, "Undoubtedly, no." In such case the courts can no more substitute their discretion for that of the board than it could for that of the legislature; and this is true, in my judgment, even though corruption be charged. The correction of that must lie only in the ballot boxes and grand jury rooms. This position is impregnable and supported by decisions everywhere, and nowhere more than in this state. *Shotwell* v. *Covington,* 69 Miss., 738 (12 South. Rep., 260); *Board* v. *Grant,* 9 Smed. & M., 90 (47 Am. Dec., 102); *Swann* v. *Buck,* 40 Miss., 290; *Swan* v. *Grey,* 44 Miss., 397; *Vicksburg R. R. Co.* v. *Lowry,* 61 Miss., 102 (48 Am. St. Rep., 76); *Mayor* v. *Rainwater,* 47 Miss., 550; *Monroe Co.* v. *Strong,* 78 Miss., 570 (29 South. Rep., 530); *Rotenberry* v. *Yalobusha Co.,* 67 Miss., 472 (7 South. Rep., 211); *Ham* v. *Levee Board,* 83 Miss., 556 (35 South. Rep., 943).

The board of control is, beyond question, a governmental board duly established by the legislature. To it, and to no other, is confided a determinative, judicial discretion. By Laws 1894, p. 66, ch. 75, sec. 3, after providing for the selection and purchase of land for penitentiary farms, this language is used: "And the board of control shall remove the convicts, or *so many as may be profitably employed,* to the land so pur-

chased as soon as the same may be *in a condition to receive them.*" In sec. 4 the board is directed to act in reference to the land bought "as soon as practicable." Section 5 is: *"Should the board of control determine* that *all* the convicts cannot be *profitably* worked on said lands and in industrial pursuits connected therewith, they are *authorized* to employ such convicts as cannot be used in such manner, not prohibited by the constitution, as may ·be *deemed most advisable* and to the best interests of the state, but *shall never part with their control and management."* Laws 1900, p. 64, ch. 56, sec. 2, after providing for the purchase of other lands for a penitentiary farm "in addition to those already owned by the state," proceeds thus: "Said land when purchased shall be occupied *as soon as practicable* by the board of control with as many convicts as *may be necessary* to occupy and manage the same." As late as 1902 (Laws 1902, p. 54, ch. 57, sec. 1) it is provided how money shall be disposed of which is received from sales of products of the "state farm *or farms worked by the state on the lease or share system."* It is too plain for argument that the legislature lodged the discretion as to all these matters, not in the judicial department, not in the executive department, but in the board of control, and with that board it must remain until the legislature makes some other disposition of it. In the condition where discretion was given the president of the board of supervisors to approve official bonds, this court said, in *Shotwell* v. *Covington,* 69 Miss., 738 (12 South. Rep., 260): "Holding, as we must, that it is settled that the power given to the approving officer is judicial, we are unable to perceive upon what principle we can decide that an *arbitrary,* or *even corrupt,* abuse of the power can be corrected by *mandamus."* In the case of *People* v. *Attorney-General,* 22 Barb. (N. Y.), 114, the effort was to compel the attorney-general by mandamus to consent to an action to try the right to a public office. The court refused to do so, and says (on pp. 117, 118): "I know it may

be said, perhaps in this very case, that with a fair show of right to an office a party may be entirely remediless against an intruder. This may be so. It is quite possible that cases may arise to which the *disturbing influence of party feeling* may so affect the action of the attorney-general as to result in great injustice to individuals. But this is a question for the consideration of the legislature, not for the court. The power of determining whether the action shall be commenced must exist somewhere. As we have seen, it has sometimes been vested in the court and sometimes in the public prosecutor. Our legislature has seen fit to invest the attorney-general with this discretion. His office is a public trust. It is a legal presumption that he will do his duty; that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern. The exercise of such discretion is, in its nature, a judicial act, from which there is no appeal and over which courts have no control. The motion for a mandamus must, therefore, be denied."

It is not for the judiciary to act because of evils which may flow from the unwise, or even improper, exercise of discretion in cases where it is lodged by the legislature. Evils and mistakes occur in all departments of government and in all human institutions. They are common even in the courts themselves in all the states and in all countries. Does it follow, therefore, that the departments and their legal agencies should be abolished? In private life every man is, and always was, bound by the acts of his agent in the exercise of discretionary powers granted to him. Yet the courts cannot interfere, even there, unless active fraud and collusion are shown. Shall men therefore be denied the right to appoint agents? But, conceding that the doubt expressed by Justice Truly, in the concurring opinion referred to—as to the power of the court to intervene where corruption is shown—be well founded, still, here the an-

swer must be the same, because the petition does not intimate
any corruption. It implies the contrary, in that, when it makes
the specific charge, it is that the board acted on the plea that
the convicts can be more profitably employed on the Sandy
Bayou place. The board, and no other power on earth, had the
right to determine this and to say when the farms owned by
the state were in shape to receive all the convicts without un-
necessary loss to the state. If this be a public evil, it is the
legislature alone which can correct it. The averments that the
board is not having the timbered land "opened as rapidly as
practicable" and that all the convicts can "easily and profit-
ably be employed" carry no legal force. They are not state-
ments of facts, but merely conclusions of the pleader, not ad-
mitted by demurrer. Even under known and admitted condi-
tions, whether a certain course is "practicable," or "profit-
able," or "necessary," will depend on the individual judgments
of men. Whether it is practicable to employ all the convicts
on the lands of the state, how many convicts are necessary to
occupy the land, whether it is profitable or wise to destroy
the timber or convert it into lumber, are matters submitted
to the unrevisable discretion of the board of control.

If we are right that this lease is warranted by law, there is
no trouble or fear about the appropriation extending to the con-
victs who are worked on the leased land. But for the leasing
system, at least until quite recently, there would have been an
enormous money loss to the state. We add that our considera-
tion has been based on the constitution as adopted, and we have
examined the precedent action of the convention in order simply
to throw light on the meaning of the word "may" as used; and
the use of the word "shall" in the substitute offered by Mr.
Muldrow (journal, p. 158), not crystallized in the constitution,
is conclusive of the correctness of our view, as we think. If
we are to go behind the instrument as adopted, in order to take
from it, or add to it, or nullify it, we must reverse and over-

throw the jurisprudence of Mississippi and other states. *Ex parte W. V. Wren,* 63 Miss., 512 (56 Am. St. Rep., 825). Otherwise no act of the legislature would ever be safe. *Green v. Weller,* 32 Miss., 650. It seems certain that "may" means "may," and not "shall." Otherwise Mr. Muldrow's suggestion would have appeared in the constitution as finally passed on and given to the people.

The contention of the appellant is that the word "may," where it appears in the article on the penitentiary, must be read "shall." Let us make a practical test of the argument and note the irresistible conclusion. Adopting this contention, the clause dealing with state farms would then read as follows: "The legislature shall place the convicts on a state farm or farms and have them worked thereon under state supervision exclusively in tilling the soil, or manufactures, or both, and shall buy farms for that purpose." If this were the legal reading of the constitution, it would have been mandatory upon the legislature to establish state farms and to buy them as well. The constitution would have gone into operation immediately upon adoption. The necessary effect of this provision would have been that the legislature would have had no discretion at all in reference to the management of the convicts; there would have been no four methods of working the convicts, but only this exclusive method of working them on farms to be bought for that purpose. As the system of hiring convicts was continued in force until December 31, 1894, there would have been no necessity for any constitutional provision vesting the legislature with power between the adoption of the constitution and the date stated; this power the legislature already had. Then, had this constitutional mandate required at all events the purchase of the farm, the other provisions of the constitution in reference to employing convicts on public works, public roads, or levees would have been absolutely nugatory. Between the adoption of the constitution and December 31, 1894, the legislature already had the power so to employ the con-

victs. After that date, if the construction of appellant is correct, the legislature would have had no such authority, because the exclusive method permitted to the legislature was that of working them on a state farm purchased for that purpose. . In this view the employment of the state convicts about the state's property in the city of Jackson since December 31, 1894, has been illegal and without any right or warrant of law. How much more reasonable is it to follow the construction placed by this court under different circumstances on this provision, and adhere to the interpretation that a state farm is a farm managed, conducted, controlled, and worked exclusively under state supervision, whether the title to the land be in fee simple or a leasehold!

The condition of the bill in the legislature referred to in the dissenting opinion is as follows: "Senate amendment to house bill No. 22. Amended by adding to sec. 1 the following: *'Provided,* That nothing herein contained shall in any manner affect or apply to any valid contract heretofore made and entered into by the board of control of the Mississippi penitentiary for the leasing of any lands belonging to a private individual or for the working of the state convicts *during the year 1906 upon lands not belonging to the state of Mississippi.'* " It will be seen that the constitutionality of the leasing system for the past, and for this year, is in no degree questioned. If the dissenting opinion had instanced cases in the history of the state where the management of leased farms, worked by the state, has been characterized by brutality, it would be valuable as a moral argument, but would not then touch the case now under investigation in a legal point of view.

*Affirmed.*

WHITFIELD, C. J., delivered the following dissenting opinion:

So far as the discretion of the chancery court to enjoin or mandamus the board of control, under the facts set out in the

former suit of *Henry* v. *State, ante,* 1 (s.c., 39 South Rep., 856),
or this suit is concerned, I simply desire to emphatically reaffirm
all that I said on that subject in my opinion in the former suit.
Subsequent reflection has simply confirmed my judgment as to
the correctness of those views in every particular.     To come at
once to the heart of the controversy, the only question of any
moment ever presented by either of these two suits is the single
question whether the board of control has, under the constitution
of 1890 or the laws of this state thereafter passed, the power
to lease a farm from a private individual and work thereon,
even under state supervision, the state convicts.     I wish also
here to emphatically reaffirm all that I said on that subject in
my dissenting opinion in the former suit.     Arguments subse-
quently made, and research subsequently made by myself, only
tend to show that the conclusion reached by me in that opinion
is the only true and sound conclusion.     I shall, however, add
to what I said in that opinion a very few observations as to
the proceedings of the constitutional convention on this sub-
ject, which to my mind demonstrate beyond any possible doubt
that the board of control had no such power.

Let us now notice briefly the proceedings of the constitutional
convention, which it is conceded may be looked to, to ascer-
tain the intent of the constitutional provisions.     I will then
notice the ordinance.     The view which has been pressed upon
us by learned counsel for the appellee is a very limited view.
While journals of the legislature have been referred to copious-
ly, the proceedings of the constitutional convention seem to
have been carefully ignored.     I assert with absolute confi-
dence that this journal shows that the makers of the constitution
expressly rejected the idea that the legislature might provide
for the working of convicts in any manner deemed by it ex-
pedient, not inconsistent with the section forbidding hiring.
Let us look at all the steps taken in the convention relative to
the penitentiary.     The printed proceedings of the convention

are inadequately indexed, and must be found by searching consecutively the pages of the minutes. I find on p. 56 that a committee on penitentiary was appointed, consisting of Messrs. Dean, Featherston, Dillard, Jones, Love, Alcorn, and Sexton. Mr. Dean (p. 57) at once introduced an ordinance prohibiting convict leasing or hiring after January 1, 1895, and requiring the legislature to provide for the abandonment of the system by that time, or sooner if practicable. Nothing more seems to have been done until the committee made its report, which will be found on p. 123. Section 1 of the report provided that the convict leasing or hiring should cease January 1, 1895, or sooner if practicable. Section 2 provided for the abandonment of the penitentiary in Jackson and provided "that the legislature shall make timely provision for and establish and maintain a prison farm" and also provided for manufactures thereon. Section 3 provided for a board of control to manage such prison farm; also provided for a reformatory, commutation in sentence, separation of sexes, etc. The committee also submitted an ordinance for the appointment by the governor of commissioners, who, prior to the next session of the legislature, should inspect lands and report as to the advantages of the bodies of land inspected. This report came on for consideration (see p. 134). A substitute was introduced, providing in effect for committing the whole management of convicts to a board of control, which evidently permitted hiring of convicts if the board of control saw proper. It seems to have been voted down or not passed. Mr. Cutrer offered an amendment permitting their employment on levees. The whole matter came up again for consideration (p. 156), and the report of the committee was considered by sections, some minor amendments being offered. The amendment of Mr. Cutrer as to working on levees was adopted, and sec. 1 was passed with this amendment. The second section of the report of the committee was afterwards called up (p. 158) and adopted. Note that this

section provided for the abandonment of the penitentiary in Jackson and that the legislature should make timely provision for the establishment and maintenance of a penitentiary farm or farms. It also contained as its last clause the following significant provision: "Or the legislature may provide for the working of such convicts in such other manner as may be deemed expedient, not inconsistent with the first section of this article." As stated, this section was, when separately considered, adopted. Thereupon Mr. Muldrow offered a substitute for the entire report of the committee, and amendments (p. 158), and this substitute practically embraced secs. 223 and 224 of the constitution as they now stand, with the exception that a clause was added, on the motion of Mr. Kennedy (p. 160), that the section should "not interfere with the preparation for or the cultivation of any crops which it may be intended shall be cultivated by the said convicts, nor interfere with the good management of the state farm, nor put the state to any expense." With this amendment added, the Muldrow substitute was adopted (p. 161), and in the hands of the revision committee became secs. 223 and 224. Section 3 was adopted with some slight amendments, and the whole matter went then to the committee on revision, which, of course, had no power to change the meaning of any section, but dealt only with arrangement, forms of expression, and phraseology.

It will thus be seen that when the matter went to the revision committee the convention had adopted a substitute which struck out that provision of sec. 2 which gave the legislature authority to work convicts in any manner not unconstitutional and deemed expedient. It will also be seen that when the revision committee took hold of the matter there was a distinct declaration in favor of the establishment and maintenance of a penitentiary farm, and accordingly Mr. Kennedy introduced his amendment (p. 160). It was natural and altogether proper that no one of the constitutional methods which might

be adopted for employing convicts should interfere with the good management of the state farm. The scheme of buying a state farm had, at that time, been definitely approved. We cannot assume that the committee on revision, when it used the words "may buy," intended to nullify the positive action of the convention in rejecting the clause giving the legislature discretion as to the manner of working convicts, provided they did not hire them out. In the light of the foregoing, the ordinance adopted (p. 167) becomes perfectly plain as to its meaning. The convention had rejected the amendment of Mr. Dillard (p. 161) for the abandonment of the penitentiary proper. Therefore the convention had determined that there were four ways in which convicts might be employed—first, confinement in the penitentiary proper; second, employment, under state supervision, on public roads, levees, or public works; third, employment on the state farm or farms; fourth, in manufacturing on state farms. The legislature might employ convicts in any one of the four schemes permitted by the constitution; and, therefore, the ordinance, when it provided that "if the legislature should determine to establish a penitentiary farm," merely meant that if it should at that time anticipate what it must do after 1894, establish a penitentiary farm, or if at any time before or after 1894 it should decide to work all the convicts on penitentiary farms, instead of on public works, levees, roads, and the like, the legislature would have the necessary data before it to decide intelligently. It is clear that the haste of the convention in providing for the committee and its report to the next legislature manifested a purpose that the scheme would be complete and operative and exclusive by the time fixed in the constitution.

It is as clear as day, therefore, whether we look to the face of the constitutional provision or the subsequent statutes or to the journal of the constitutional convention, that the purpose was to abolish the leasing of land and employment thereon

of convicts. I make it as a special request and appeal to the splendid bar of this state to read carefully every one of the pages I have referred to in the journal of the proceedings of the constitutional convention; and I assert, without the slightest fear as to what the judgment of the bar will be, that this review of those provisions demonstrates that the makers of the constitution, in rejecting the following proposed addition to sec. 2 of the report of the committee, found on p. 158 *et seq.*, repudiated emphatically, once and forever, the idea that the legislature could, under the constitutional provisions, provide for the working of the convicts in any other manner deemed expedient, not inconsistent with the first section of that report. That proposed addition is in the following words: "The legislature may provide for the working of such convicts in such other manner as may be deemed expedient, not inconsistent with the first section of this article." What, exactly, was it that was proposed by this addition? Why, that the legislature might deal with the convicts as it deemed expedient, provided only that it did not hire them out; in other words, that it might lease the farm of a private individual and work the state convicts thereon. That is exactly what counsel for appellee have from first to last insisted on as the true sense of secs. 223, 224, 225, of art. 10 of the constitution. That is their whole contention; that is their exact contention. And yet this identical contention was emphatically repudiated by the constitution makers when they rejected the above-recited proposition. And with, the rejection of that proposition went down, once more and forever, the whole basis of the argument so earnestly insisted on by learned counsel for appellee in this cause. And yet this proposition, and the action of the convention in repudiating it, is ignored in the opinion of the majority. Marvelous indeed! They give us " 'Hamlet' with the prince left out!"

And yet, ignoring this vital and controlling fact, the opinion

of my brethren has sought to find comfort for their view in the language of the ordinance adopted at p. 167, which is as follows:

"Section 1. That, with the view of enabling the legislature at its next session to have before it the necessary information upon which to act, if it should be determined to establish a penitentiary farm, it is made the duty of the governor to appoint five commissioners, who shall, prior to the next session of the legislature, carefully inspect such bodies of land as may be thought suitable for such location, and who shall make report as to the several advantages of the bodies of land inspected by them, and as to the propriety of establishing such farm or some other system, and as to the advantages of each, cost, and other proper matters, to the governor, to be laid before the legislature, with such recommendations as he may see proper to make."

The particular language on which they count is this: "if it [the legislature] should determine to establish a penitentiary farm." And the argument is that it is thus shown that it was left to the absolute discretion of the legislature whether to establish a penitentiary state farm at all or not; and the deduction is sought to be drawn that, if the legislature should determine not to establish the state farm in the exercise of this supposed discretion, then it might employ the convicts in any way it saw proper—provided, only, that it did not hire them out. As to the first proposition, let it be carefully noted that the scheme of buying a state farm—not leasing it—at the time this section was modified and adopted, had already been definitely approved. All on earth that was meant by the words "if the legislature should determine to buy a farm" was if the legislature should determine to buy a farm immediately, for the 1st of January, 1895. · Section 223, art. 10, of the constitution, had already fixed as the polestar of the whole matter, for the guidance of the legislature, the exact date,

December 31, 1894, after which there could never be any deal-
ing with convicts, except in four modes—first, employment
of convicts in the penitentiary proper; second, employment,
under state supervision, on public roads, levees, and public
works; third, in manufacture, on state farms; fourth, employ-
ment on the state farm or farms. The period from the adop-
tion of art. 10 of the constitution until the 1st of January,
1895—a period of some four years—was deemed by the mak-
ers of the constitution ample time in which the legislature
could, through the commissioners, buy a farm or farms and put
the convicts to work on said farm or farms.

But as there were four years of this interim during which
the legislature should, with conservative judgment and careful
deliberation, put into effect the constitutional scheme—the
great, paramount, constitutional scheme of buying farms and
putting the convicts on them to labor there—it was a very
proper thing to provide in this section that the legislature
might determine not to buy the farms and put the convicts on
them immediately. If one will keep in view—as one mani-
festly should—the great dominating purpose of the constitution
makers to forever end the system of hiring convicts out to
private individuals and to concentrate them on said farms to
be bought, there is not the slightest difficulty in understanding
that these words, "if the legislature should determine," etc.,
were not, of course, meant to give the legislature the absolute
discretion to buy farms or not to buy them at all, but simply
to allow them to determine whether they should put this con-
stitutional scheme into effect at once or at the end of the four
years allowed for its inauguration. It would be a *reductio ad
absurdum*—nothing short of it—to hold that the great constitu-
tional scheme of buying farms and of putting the convicts on
farms, so carefully framed by the makers of the constitution,
was at last nothing but *brutum fulmen,* absolutely nullified by
the mere ancillary provision in this section—if it should de-

termine, etc.—which was nothing but a mere ancillary clause, relating, not to the command that they should buy farms, but to the particular time within four years when the legislature should determine to buy farms. And yet such is the desperateness of the strait in which my brethren find themselves that they are driven to construe this merely incidental, ancillary clause—administrative clause; clause relating to time, and to time alone—into a provision absolutely superseding and blotting out the great paramount scheme of buying farms and working convicts on the farms, standing out in bold relief, clear as a mountain in the landscape.

Another patent fallacy in the reasoning of my brethren is this: That they pivot the whole argument as to the power of the board of control to lease the farm of a private individual upon whether the word "may" buy farms in sec. 225 of the constitution is permissive or mandatory. This is a. complete *non sequitur.* I think I have demonstrated above, and also demonstrated in my dissenting opinion in the former suit, that the word "may" is here plainly mandatory, because the enforcement of the constitutional scheme, which is the thing which should dominate the entire construction of these constitutional sections, imperatively requires the word "may" to be treated as mandatory. Certainly it is perfectly obvious that the constitution makers themselves used the word "shall," and it was the revision committee only which substituted "may" for "shall." No revision committee had the power, by mere revision of the phraseology of a. provision already adopted by the constitution, to change in the least respect the real. effect of what the constitution makers had so already done; and I apprehend that no thought was further from the minds of this revision committee than to make any such changes, but that they simply meant to indicate, by the use of this word "may," not that the legislature was at liberty not to buy farms at all, but that, since they must choose between the four modes named

in which they might deal with the convicts, the legislature might postpone the buying of the farms, not buying immediately—provided, only, it bought them in time to put into effect the great constitutional scheme by the 1st of January, 1895.

But suppose, for the sake of argument, notwithstanding the awful wrench of logic and of constitutional construction which such a supposition necessarily involves, that the word "may" was permissive, and that the legislature had absolute discretion granted, by such permissive use of the word "may," whether to buy farms at all or not; in what conceivable way does this admission work out power on the part of the legislature to authorize the board of control to lease a private farm? The only effect on earth such permissive use of the word "may" could possibly have would be to cut out one of the four modes which the constitution had expressly and imperatively prescribed as the only modes in which convicts could be dealt with, and leave the legislature its choice between the three other modes—to wit: first, confinement in the penitentiary proper; second, employment, under state supervision, on public roads, levees, and public works; and, third, the hiring of convicts until, and only until, the 31st of December, 1894. There is not the slightest hint, not the faintest adumbration, in these three sections of the constitution (223, 224, and 225) of any power in the legislature to lease, or to authorize any board of control to lease, the farm of a private individual—none whatever; and yet, with the great statesmen and the great lawyers who composed the membership of the constitutional convention of 1890 with the greatest care and particularity definitely setting forth only four modes in which the convicts could be dealt with, and as definitely and emphatically excluding the power to lease the farm of any private individual, my brethren are in the desperate situation of having to resort to the words "if the legisla-

ture shall determine," and the permissive construction of the word "may" in the phrase "may buy farms," as their only hope to escape enforcement of the positive mandate of the great constitutional scheme plainly set down in the three sections of the constitution above referred to. With all deference to my brethren, I refuse most emphatically to subscribe to any such doctrine.

Let us, in conclusion, test their construction by the result to which it plainly may lead. All men know that the one great object of art. 10 of the constitution was to put an end, once and forever, to the horrors and unspeakable brutalities of the system of hiring out convicts to private individuals which had obtained for thirty years past, and to put an end to it by constitutional mandate, so as to place it forever out of the power of any legislature to revive that system, with its infamies, directly or indirectly. And this was placed in the constitution for the very reason pointed out in my dissenting opinion in the former suit—to wit, that previous legislatures, in the past, in the face of investigations disclosing these infamies, had strangely enough persisted in refusing to right this great wrong. That being the object of the constitution makers in adopting this art. 10 of the constitution, how will that object be accomplished by the construction adopted by the majority of the court? Their conclusion is, expressly and necessarily, that whenever the legislature. sees proper it may authorize the leasing of the lands of a private individual and the working of the convicts on such lands, if only the working be under state supervision. Is it not open and level to the simplest understanding that under this system there may occur in the future the very same outrages and brutalities which have covered with unspeakable obloquy the state's treatment of the state convicts in the past? What more is necessary to revive, in all its horrors, the system which the people of this state, justly shocked and outraged, attempted forever to put an end

to by this great constitutional scheme, except that some succeeding legislature, in the future, shall repeal the act now pending, if adopted by this legislature, forbidding the leasing of the lands of a private individual? Most manifestly, with that act repealed at any time in the future, the very system which the constitution repudiated and which, so far as this feature is concerned, the present house of representatives of this legislature with but two dissenting votes, and the present senate of this legislature unanimously, have repudiated, and most wisely and righteously repudiated, may be again put in force in this state.

So far as the case of *State of Mississippi* v. *Board of Levee Commissioners,* 75 Miss., 132 (21 South. Rep., 661), strongly relied on by the majority of the court, is concerned, I desire simply to say—what is perfectly obvious—that the question as to the power of the board of control to lease a private farm was not in the slightest degree involved in that case; nor, for that matter, has it ever been presented for decision in any case in this state until the former suit herein—the injunction suit—and this present suit. The sole question argued and decided in that case was, as stated in the syllabus, that "cotton produced by convicts under the control and management of the state, upon the penitentiary farms in a levee district, is not subject to the cotton tax or other levee taxes." That exactly, and nothing else, was the point, and the only point, involved or decided in that case. The casual expressions thrown out *arguendo* in that case to the effect that "the state farms are local and movable penitentiary farms," etc., are entirely beside the point involved here, and furnish no sort of aid in this decision. It is too elementary law for serious observation that the language of a court is to be taken strictly with reference to the precise point adjudicated. And the precise point adjudicated there has not the most distant relation to the point presented here for the first time in the history of this state.