SINCLAIR *v.* STATE.

(In Banc. Feb. 16, 1931.)

[132 So. 581.   No. 28673.]

**M. S. McNeil,** of Hazelhurst, for appellant.

J. W. Cassedy, Jr., of Brookhaven, for appellant.

**Forrest B. Jackson,** Assistant Attorney-General, for the state.

**Hugh V. Wall,** of Brookhaven, and **J. H. Price,** of Magnolia, for appellee.

**PER CURIAM.**

Appellant was charged by indictment in the circuit court of Pike county of the murder of one William Ray-

ford Allen, and upon being put to trial there was entered on appellant's behalf a suggestion or plea of insanity, at the time of the homicide, to which the state replied that under the express terms of chapter 75, Laws 1928, sections 1327, 1328, Code 1930, "the insanity of the defendant at the time of the commission of the crime shall not be a defense against indictments for murder and the courts shall so instruct the jury in trials for murder. . . . "

After the opening of the trial and during the progress thereof, it was agreed by and between the state, acting through the district attorney, and appellant by his counsel that the jury should return the following verdict: "We, the jury, find the defendant guilty as charged, but insane at the time of the commission of the homicide, and fix his punishment at life imprisonment in the state penitentiary," which verdict was received by the court, and thereupon appellant was sentenced to the penitentiary for life.

This agreement by the district attorney had the effect of a solemn admission on the part of the state that appellant was in fact insane at the time of the homicide, see Coster v. State, 16 Ala. App. 191, 76 So. 475; and we are, therefore, squarely confronted with the question whether the said act of the legislature which attempts to abolish the defense of insanity is constitutionally valid. This question has been maturely considered by the court, and has been the subject of repeated conferences. The majority of the court have reached the conclusion that the said act is unconstitutional and void, because in contravention of section 14, Constitution 1890, which ordains that "No person shall be deprived of life, liberty, or property except by due process of law." The reasoning and authority by which the majority of the court arrive at this conclusion is disclosed in the concurring opinions.

The result is, therefore, that the said statute is void, and that the judgment of the court, pronounced in obedi-

ence to it, is without constitutional support. The judgment is reversed, and the appellant discharged from the indictment.

Reversed, and appellant discharged.

**McGowen, J.,** delivered a specially concurring opinion.

I specially concur in the conclusion, reached by a majority of this court, that the statute here under review is in violation of section 14 of the state Constitution, 1890.

I also concur in the conclusions reached by Judge ETHRIDGE in his separate opinion, except that part of the opinion which invokes section 32 of the state constitution. I am firmly of the opinion that section 32 should not be construed to protect the rights of any citizen unless and until the subject-matter under review is not enumerated within the other sections of the constitution as written. It cannot be that section 32 is violated if and when it is ascertained that section 14 strikes down the given statute.

My fixed conviction is that the statute here considered by this court violates section 28. I am of opinion further that the trial court correctly interpreted the statute as shown by his action when he consented to the verdict returned in this case. In other words, if the statute could be upheld it means that an insane man, as heretofore defined by this court, could not only be convicted of murder, but that the trial court would be authorized to put him on trial while he was so insane.

Entertaining these views, I am content to forego the temptation of elaborating my views on this important question.

I am directed by Judge Cook to say that he concurs in the views herein expressed.

**Ethridge, J.,** delivered a specially concurring opinion.

Frank Sinclair was indicted and convicted of murder, but was found by the jury to be insane at the time of the killing. The verdict undertook to conform to chapter 75 of the Laws of 1928, which provides that insanity shall not be a defense to murder, but the proof of insanity may be offered in mitigation of the crime, and that the jury if they find from the evidence that the defendant was insane at the time of the commission of the act shall so certify in their verdict, or if they cannot agree on whether he was insane at the time of the verdict or not they shall so state, and the judge shall sentence the defendant to imprisonment for his natural life in the penitentiary. In the case before us there was ample evidence from which the jury could find that the defendant was insane at the time of the commission of the homicide. Sections 1 and 2 of chapter 75, Laws of 1928, reads as follows:

"Be it enacted by the Legislature of the State of Mississippi, That from and after the passage of this act, the insanity of the defendant at the time of the commission of the crime shall not be a defense against indictments for murder and the courts shall so instruct the jury in trials for murder, but evidence tending to prove the insanity of the defendant at the time of the commission of the offense may be offered by the defendant in mitigation of the crime. In the event the jury shall find the defendant guilty as charged in the indictment, but insane at the time of the commission of the crime, they shall so state in their verdict, and shall fix the penalty at imprisonment in the state penitentiary for life, and should the jury find the defendant guilty as charged, but fail to agree on the insanity of the defendant at the time of the commission of the crime, they shall so state in their verdict, and the court shall then fix the punishment as in other trials for murder where the jury finds the de-

fendant guilty as charged, but fails to agree on the punishment.

"Sec. 2. If the jury finds the defendant guilty, but insane at the time of the commission of the crime; or find the defendant guilty as charged, but disagree as to his sanity; and the trial judge fixes the penalty at imprisonment in the state penitentiary for life, the trial judge may, in his discretion, certify to the governor that in his opinion the mental condition of the prisoner is such that he should not be confined in the penitentiary, in which event the governor shall cause an investigation to be made by one or both of the superintendents of the state institution for the care of the insane and by any other means he may deem proper, and if satisfied that the mental condition of the defendant is such that he should not be confined in the penitentiary he shall order the transfer of such prisoner to one of said institutions for the care of the insane, and in like manner the governor may on information derived from the superintendent of said state institution for the care of the insane where a person convicted under this act is confined, or from other sources, investigate the matter and order the transfer of such person to the state penitentiary. The governor may, at any time under like conditions, order any person held under authority of this act transferred from the penitentiary to the State Insane Asylum.''

It is evident from a careful reading of these two sections together that the first section would not have been enacted but for the provisions of the second section.

On appeal here the sole question argued is the constitutionality of chapter 75, Laws of 1928. It is challenged on the ground that it violates the provision of the constitution against cruel or unusual punishments, and that it violates the due process clause of the state (Constitution 1890, section 14) and federal constitutions (Amendment 14) and the equal protection clause of the

federal constitution (Amendment 14), and the provisions of section 26 of the state constitution of 1890, and especially that part of it guaranteeing a fair and impartial trial by a jury. Section 28 of the constitution of 1890 provides: ''Cruel or unusual punishment shall not be inflicted, nor excessive fines be imposed.'' This section of the constitution being embraced in and a part of the bill of rights and being designated for the protection of the citizens against those exercising the powers of government should receive a liberal construction. In other words, the provisions embraced in the bill of rights are liberally construed by the court in favor of the liberties of the citizens. Falkner v. State, 134 Miss. 253, 98 So. 691; Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; Gouled v. U. S., 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647. Many other cases could be cited to the same effect, but I deem these citations sufficient to show that such provision should receive a liberal construction. In construing the constitution the duty of the court is to ascertain the meaning of the constitution as intended by its framers, and to give it its full legal and logical effect first without reference to any statute enacted by the legislature; after this construction is arrived at, then the court will take the statute challenged as being in conflict with it and give it a construction, if reasonably possible, consistent with the constitution. If there are two or more reasonable constructions that may be placed upon the statute, one of which would render it unconstitutional and the other would render it constitutional, the court will adopt that construction of the statute which renders it constitutional, although the construction which would render it unconstitutional may be the more probable or reasonable construction. The protection of the constitution is never to be impaired in order to save a statute, but a statute will be given a reasonable construction, if possible, to make it conform to the constitution. Another rule of construction is that the con-

stitution should be construed so as to effectuate and not defeat the policies indicated by its framers. Brien v. Williamson, 7 How. (Miss.) 14. As applied to the case before us, would it be cruel or unusual to convict a person of murder and impose a life sentence upon him when he was totally insane and incapable of knowing the nature and quality of the act constituting the crime at the time the crime was committed? This question is totally different from the question of confining an insane person who may be dangerous to himself or to the community at large or to any particular person during the period of his insanity. Insanity to the extent that the reason is totally destroyed so as to prevent the insane person from knowing right from wrong, or the nature and probable consequence of his act, has always been a complete defense to all crimes from the earliest ages of the common law. The common law proceeds upon an idea that before there can be a crime there must be an intelligence capable of comprehending the act prohibited, and the probable consequence of the act; and that the act is wrong. Shall such an insane person be branded with the stigma of felony when he was wholly unable to comprehend the nature and quality of the act designated, and is it competent for the legislature to make an act a felony and brand the person with the stigma of disgrace under such circumstances? Blackstone in his Commentaries on the common law, in discussing insanity, mentions a case that occurred in the reign of Henry VIII when a statute was' enacted which provided that if a person with a sane mind committed treason and afterwards became mad, he might be tried in his absence and suffer death, as if of perfect memory. Of this incident he said: "But this savage and inhuman law was repealed by the statute, 1 and 2 W. M. Chap. 10. For, as is observed by Sir Edward Coke (n) 'the execution of an offender is for example, ut poena ad paucos ad omnes perveniat (that the punishment may reach the few, but

the fear of it affect all); but so it is not when a madman is executed; but should be a miserable spectacle, both against law, and of extreme inhumanity and cruelty, and can be no example to others.''

If the purpose of the law is not only to inflict punishment for the commission of prohibited acts, but to set examples which will restrain others from doing like acts, it is manifest that the punishment of the insane will not prohibit or deter another insane person from doing another similar act; it can have no effect upon another insane person, and it is certainly shocking and inhuman to punish a person for an act when he does not have the capacity to know the act or to judge of its consequences. This has been the law throughout the history of this state, and the history of the English nation prior to the American Revolution. In other words, it has been the long-settled conviction of the people through every age of which we have any knowledge of the English thought and sentiment. All civilized nations have recognized that it was futile and useless to undertake to punish a person who is non compos mentis for any act either to restrain such person from committing another act of the same or similar kind, or to make him feel that respect for the law and for human society and welfare that a sane person should feel. As stated by Blackstone in his Commentaries, a madman is punished by his madness alone; that affliction is severe enough for any human purpose. As applied to the crime of murder, it has always been regarded as necessary to entertain a specific intent to kill without legal excuse or the conscious and willful doing of an act eminently dangerous to others, and to evince a depraved heart disregardful of social duty and fatally bent upon mischief. Intent is a necessary element of every crime in the sense that a person must be able to comprehend the nature of the act, although he may not specifically intend the particular results. Malice has always been an essential element of

murder. Wharton on Criminal Law (10 Ed.) 129, sec. 106; People v. Flack, 125 N. Y. 324, 26 N. E. 267, 11 L. R. A. 807; 14 R. C. L. 598, sec. 54; State v. Strasburg, 60 Wash. 106, 110 Pac. 1020, 32 L. R. A. (N. S.) 1216, Ann. Cas. 1912B, 917; Grissom v. State, 62 Miss. 167; Myers v. State, 99 Miss. 263, 54 So. 849; Smoot on Insanity, p. 372. In the last work mentioned it is said: "Insanity is considered, in the jurisprudence of all civilized nations, to be a defense against punishment for crime. It is usually set out among the recognized defenses in the criminal codes of the several states. The reason for allowing it as such a defense is obvious. One of the essential ingredients of crime is intent. Intent involves an exercise of the reasoning powers in which the result of the criminal act is foreseen and clearly understood. Another essential element of crime is animus. Animus involves an exercise of reasoning powers, in which the result of the criminal act is recognized as being contrary to the rules of law and justice. If a person is mentally unsound, one or both of these elements may be, and usually are, wanting. An idiot may set fire to a house without understanding that it will result in the destruction of the house, or that it is forbidden by law. In such case, there would be an absence of both intent and animus. A monomaniac may kill a man under the insane delusion that the man is an enemy who is about to kill him. Here there is an intent, as the monomaniac clearly understands, that the act will result in the victim's death; but there is a lack of animus, because he believes that he is justified, and that the act, therefore, is right in the sight of the law. It is clear, then, that where the mind of the perpetrator is so diseased as to exclude the presence of an intent or animus in the commission of the crime in question, he should not be punished as a criminal. So closely has the idea of insanity as a defense to crime been woven into the criminal jurisprudence of English speaking countries that it has become a part of the fundamental laws thereof, to the ex-

tent that a statute which attempts to deprive a defendant of the right to plead it will be unconstitutional and void.''

The provisions of the state and federal constitutions prohibiting cruel and unusual punishments were designed to protect the people, not only from barbarious methods of inflicting punishment, but to prevent harsh, unjust and unreasonable punishments, considering the act prohibited in relation to the punishment imposed. In other words, it may be perfectly permissible to inflict life imprisonment or death for murder when done with malice aforethought, yet it would be utterly unreasonable and unjust and inhuman to punish a petty misdemeanor with life imprisonment or death. It certainly would be cruel and unusual to punish a child of tender years, incapable of judging the consequences of its act, should it, through misjudgment or otherwise, administer poison to another child or to another person. It would be equally cruel and equally as unusual to impose life imprisonment or death upon any person who did not have intelligence enough to know that the act was wrong or to know the consequences that would likely result from the act. The prohibition of the constitution extends to every agent and agency of the government. It is binding upon the legislature as well as upon the courts. In a few of the states this view has been rejected, but it is certainly supported by the better reason and by the supreme court of the United States. In Weems v. U. S., 217 U. S. 349, 30 S. Ct. 544, 54 L. Ed. 793, 19 Ann. Cas. 705, it was held that it was binding upon all the agencies of the government; it was also held in this case that it did not intend merely to prohibit the punishments inflicted in the past deemed to be cruel and inhuman, but that it reached the future as well as the past. The court said (217 U. S. 349, 30 S. Ct. 544, 551, 54 L. Ed. 793, 19 Ann. Cas., p. 711): ''Legislation, both statutory and constitutional, is enacted, it is true, from an experience of

evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice MARSHALL, 'designed to approach immortality as nearly human institutions can approach it.' The future is their care, and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value, and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality. And this has been recognized. The meaning and vitality of the constitution have developed against narrow and restrictive construction.''

The court then discusses certain cases and says: ''But general discussion we need not farther pursue. We may rely on the conditions which existed when the constitution was adopted. As we have seen, it was the thought of Story, indeed, it must come to a less trained reflection than his, that government by the people, instituted by the constitution, would not imitate the conduct of arbitrary monarchs. The abuse of power might, indeed, be apprehended, but not that it would be manifested in provisions or practices which would shock the sensibilities of men. Cooley, in his 'Constitutional Limitations,' apparently in a struggle between the effect to be given to ancient examples and the inconsequence of a dread of them in these enlightened times, is not very clear or decisive. He hesitates to advance definite views, and

expresses the 'difficulty of determining precisely what is meant by cruel and unusual punishment.' It was probable, however, he says, that 'any punishment declared by statute for an offense which was punishable in the same way at common law could not be regarded as cruel or unusual, in a constitutional sense.' And he says further that 'probably any new statutory offense may be punished to the *extent* (italics ours) and in the mode permitted by the common law for offenses of a similar nature.' In the cases in the state courts, different views of the provision are taken. In State v. Driver, 78 N. C. 423, 427, it was said that criminal legislation and its administration are so uniformly humane that there is seldom occasion for complaint. In that case, a sentence of the defendant for assault and battery upon his wife was imprisonment in the county jail for five years, and at the expiration thereof to give security to keep the peace for five, in the sum of five hundred dollars, with sureties, was held to be cruel and unusual. To sustain its judgment, the court said that the prohibition against cruel and unusual punishment was not 'intended to warn against merely erratic modes of punishment or torture, but applied expressly to ''bail,'' ''fines'' and ''punishments.'' ' It was also said that 'the earliest application of the provision in England was in 1689, the first year after the adoption of the Bill of Rights in 1688, to avoid an excessive pecuniary fine imposed upon Lord Devonshire by the court of King's bench. 11 How. St. Tr. 1354.' Lord Devonshire was fine thirty thousand pounds for an assault and battery upon Colonel Culpepper, and the House of Lords, in reviewing the case, took the opinion of the law Lords, and decided that the fine 'was excessive and exorbitant, against Magna Charta, the common right of the subject, and the law of the land.' Other cases have given a narrower construction, feeling constrained thereto by the incidences of history.''

This opinion by the United States supreme court is a splendid discussion of the subject, and, as stated, takes

the view that applies to all branches of government and is not limited to the practices of the past but embraces any future cruelty that may be devised by the ingenuity of man.

In State v. Whitaker, 48 La. Ann. 527, 19 So. 457, 35 L. R. A. 561, the record of the court disclosed that the relators in that case had been committed to the parish prison for a period of two thousand one hundred sixty days in default of making payment of fines amounting to seven hundred twenty dollars for each and costs of prosecution, for the violation of a city ordinance, in committing a trespass upon one of the public parks in New Orleans, and it further appeared that the respondent had been found guilty of seventy-two distinct violations of one ordinance within one hour and forty minutes, each one of said offenses succeeding the other, only one and one-half minutes intervening between the commencement of any two of them. It was held in that case that such a punishment was unusual and unreasonable in the sense of the constitution.

It seems to me that there could be no greater cruelty than trying, convicting, and punishing a person wholly unable to understand the nature and consequence of his act, and that such punishment is certainly both cruel and unusual in the constitutional sense. It is true that there has been much difficulty for the courts to draw distinctions and limitations upon the legislative power to enact laws for the peace and order of society; but nevertheless the legislature is restrained by the constitution for the protection of the people, and among these restraints is that there shall be no cruel or unusual punishments, nor excessive fines imposed under any authority of the state. Severe laws often defeat their aims, and I am satisfied that chapter 75 of the Laws of 1928 violates this provision of the constitution.

I am also of the opinion that it violates the due process clause of both state and federal constitutions. There is

no provision of the constitution that has had more discussion and applied to a greater variety of acts and conduct than has this clause of the federal constitution. It has been construed and declared to mean not only process to bring a person into court and there to give him a hearing with an opportunity to present proof to sustain his contentions, but has been construed to mean that the law itself must be certain and reasonable so that the citizen may know from the statute itself just what acts are prohibited, and this is not to be left to the judgment of different judges or different juries. U. S. v. L. Cohen Gro. Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A L. R. 1045: Kennington v. Palmer, 255 U. S. 100, 41 S. Ct. 303, 65 L. Ed. 528.

It has also been construed that the Fourteenth Amendment requires that state action shall be consistent with the fundamental principles of liberty and justice which lie at the basis of our civil and political institutions. Hebert v. State of Louisiana, 272 U. S. 312, 47 S. Ct. 103, 71 L. Ed. 270, 48 A. L. R. 1102; Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960.

It has been held in numerous cases that the states could not abridge the liberties of a citizen embraced in the Fourteenth Amendment, and that the liberties there embraced were the vital rights of a citizen as asserted at common law when the constitution was adopted. The term has been given a most comprehensive definition. See Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446, and various authorities referred to in that opinion. See also 6 R. C. L. titled Constitutional Law, subtitled Due Process of Law, p. 433, et seq., U. S. Sup. Ct. Rep. Digest (L. Coop. Ed.), entitled Constitutional Law, subtitled Due Process of Law Guaranteeing Right of Life, Liberty and Property, p. 2012, sec. 513, et seq.

It will be seen from a study of chapter 75, Laws of 1928, that it does not define just what acts under that

chapter constitute murder, and it does not say whether an intent must exist or not, and, if any intent, what kind of an intent. In other words, the statute does not undertake to create and define a crime. It apparently leaves the definition of murder as embraced in other sections of the Code, and then attempts to enact by legislative fiat that insanity cannot destroy the mind so that it cannot form an intent, or "deliberate intent," to use the precise words of the statute. In other words, it is equal to saying that malicious intent is obtained by legislative declaration merely; this, as has often been said by the courts, cannot be done. The chapter does not define with precision just what the legislature intended to punish; it does not declare with any reasonable certainty that deliberation and intelligence shall not continue the basis of the definition of the intent defining murder. In other words, it leaves the definition of murder unimpaired. Apparently it undertakes by legislative declaration to say that the nonexistence of one of these necessary elements is immaterial, and that, although absent, such person shall be branded as a felon for the period of his natural life. To constitute due process of law in the enactment of a statute it is necessary to define with certainty the act and intent involved which make out the crime; it must be so certain that the definition is found in the law itself. See authorities cited above. Could the legislature, consistent with due process of law, abolish the right of self-defense? Manifestly it could not, and no person will disagree with this statement.

In the light of the declarations of the United States supreme court, the Fourteenth Amendment was intended to protect the fundamental rights of the citizen in the enjoyment of his life, liberty, and property against state action. Certainly as much perjury has been committed in homicide cases in trying to establish self-defense as any other defense. It seems to be the choice defense. Certainly the amount of perjury in establishing this de-

fense, or in attempting to do so, exceeds that in cases of insanity. There is no sufficient basis for the enactment of the statute under review related to any purpose of government that will justify its enactment under the due process clause. There must be a reasonable relation to some purpose of government, and the statute must reasonably tend to serve that purpose before it can be due process of law.

I also think the statute violates the equal protection clause of the federal constitution. The equal protection clause of the constitution of the United States is not specifically made a part of the Mississippi constitution, yet it is as fully a part of the constitution of Mississippi as it is of the United States, because each officer, executive, legislative, and judicial, is bound to support and give effect to that clause of the constitution. Moreover, it is among the rights, in my judgment, reserved to the people as a part of their inherent rights in section 32 of the constitution. The reading of the statutes on homicide in Mississippi will show that all unlawful killings where deliberation or the entertainment of a specific intent is not involved, or where the act is not so dangerous and reckless as to evince total depravity and disregard of human life, are made manslaughter by statute. Quite a number of this character of killings are made manslaughter, and the maximum punishment for manslaughter is twenty years in the state penitentiary. A person in full possession of his faculties who kills a person unlawfully but with no specific intent to take life, or where there is not such a reckless and gross disregard of social and human safety as to make murder, commits manslaughter, and the maximum punishment is as above stated; but under the statute involved here, chapter 75, Laws of 1928, an insane person is sentenced for his natural life regardless of how long that life may last. It is easily possible for such imprisonment to exceed fifty years in the state penitentiary. It might even extend to sixty or more years in the state penitentiary.

The test of the constitutionality of an act is, not what is actually done in a particular case, or what may be done in a particular case, but is what may be done under the law. The statute is the measure by which we test its constitutionality. It clearly authorizes punishment which, in the ordinary course of affairs, may be discriminatory and unequal as against a sane person. It is certainly not a reasonable classification to single out the insane helpless and impose burdens upon them which are not placed upon people with intelligence, or with sufficient knowledge to know the probable consequences of their act, and whether it was right or wrong.

Again, the act, chapter 75 of the Laws of 1928, in the second section, enables the judge, at his arbitrary will, to say whether the person shall be sent to the insane asylum or to the penitentiary.

In the first instance, there is no force to move his will, and no right given the convicted person to set that discretion in motion. There is no hearing that may be had on behalf of the person under this section. If the judge decides, no matter for what reason, that the person ought not to be sent to the insane asylum, he goes to the penitentiary. There is no force that can change this arbitrary discretion of the judge; no hearing is provided and none can be had. If, on the contrary, he decided the person ought not to go to the penitentiary, he alone can set in motion the machinery, and he alone is the judge of whether the facts exist that warrant his being withheld from the penitentiary for treatment, or whether he shall go to the penitentiary regardless of his mental condition. If he is committed to the hospital for treatment he may be removed on the personal judgment of the governor regardless of the proof; no hearing or proof is provided for under the statute, and none known to the law. It is entirely a proceeding unique in itself. If the governor decides a person has recovered and wants him sent to the penitentiary, to the penitentiary he goes regardless of the actual facts; he has no chance to present them

or to have any hearing or to institute any inquiry with reference to the true facts. This clearly violates the due process clause of the constitution. In re Boyett, 136 N. C. 415, 48 S. E. 789, 67 L. R. A. 972, 103 Am. St. Rep. 944, 1 Ann. Cas. 729; see, also, In re Lambert, 134 Cal. 626, 66 Pac. 851, 55 L. R. A. 856, 86 Am. St. Rep. 296; Underwood v. People, 32 Mich. 1, 20 Am. Rep. 633; Doyle, Petitioner, 16 R. I. 537, 18 A. 159, 5 L. R. A. 359, 27 Am. St. Rep. 759, and case note.

I am also of the opinion that section 26 of the constitution is violated by the chapter. This section provides that: "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed; and he shall not be compelled to give evidence against himself; but in prosecutions for rape, adultery, fornication, sodomy or the crime against nature the court may, in its discretion, exclude from the courtroom all persons except such as are necessary in the conduct of the trial." Of course, it comprehends an intelligent exercise of these rights; it presupposes the defendant to be in possession of his faculties, able to comprehend what is taking place and to be able to advise with counsel and to know what witnesses are necessary for his defense and to have a knowledge of what he himself was doing at the time the alleged offense was committed, and if not present at the homicide to be able to understand where he was, who was with him, and what he was doing, and to so advise counsel in order that he may have such persons as he may be able to procure present in court. It comprehends also the knowledge of what is taking place at the time of the trial. The proof in this case shows conclusively that if

the defendant was insane at the time of the homicide he was likewise insane at the time of the trial. The proof tended to show, and the jury found, that he was insane at the time the crime was committed. The law presumes such insanity continues to exist until the contrary is shown. The contrary has not been shown, but, on the contrary, it has been affirmatively shown that there was no improvement in his mental condition between the alleged homicide and the time of the trial. The proof shows that he sat through the trial in an indifferent, dazed, hazy state of mind, totally oblivious of what was taking place, and it was the opinion of physicians who observed him carefully during the trial that he was unable to understand what was taking place. The giving of the rights embraced in section 26 would be utterly useless unless the defendant is in a condition of mind to exercise them. The rights contemplate that he shall not be put to trial under such condition. State v. Harris, 53 N. C. 136, 78 Am. Dec. 272.; Marshall v. Territory, 2 Okla. Cr. 136, 101 Pac. 139; State v. Lange, 168 La. 958, 123 So. 639, 67 A. L. R. 1447; Webber v. Com., 119 Pa. 223, 13 A. 427, 4 Am. St. Rep. 634; State v. Strasburg, 60 Wash. 106, 110 Pac. 1020, 32 L. R. A. (N. S.) 1216, Ann Cas. 1912B, 917; 3 Bishop's Criminal Procedure, sec. 666; Blackstone's Commentaries, Bk. IV, chap. 2, p. 25; Hawie v. State, 121 Miss. 197, 83 So. 158, 10 A. L. R. 205.

I believe the statute violates each of the provisions of the Constitution above touched upon, and if so the statute must go down as being utterly beyond the power of the Legislature to enact. I reached this conclusion with the utmost respect for the Legislature and its large power to enact laws to secure the safety and welfare of the people of the state. It is true that there has been much abuse of the defense of insanity throughout the country and perhaps an undue public sentiment that the abuses of this defense should call for its utter abrogation. If

there be such probable opinion, it is temporary and has not been expressed in this state in any cognizable way until the enactment of the statute under review. The Legislature has a very broad field of action, and when it acts within its constitutional powers the court must and will give effect to its will thus expressed in the statutes of the state; but the court must also give effect to the Constitutions of the state and of the nation and no popular opinion, however strong, and no legislative action can abrogate the Constitution. We are called upon to maintain the Constitution against all of the agencies and persons exercising the authority of the state. Therefore the conviction should be reversed.

**McGowen** and **Cook, JJ.,** concur.

**Griffith, J.,** delivered a specially concurring opinion.

It is argued by the state, and all the arguments by the state are within the contention, that there is no express prohibition contained in the Constitution against this legislation. So thoroughly considerate have the courts always been of, and so obedient to, the principle that no act of the Legislature shall be declared invalid unless clearly irreconcilable with the Constitution, that in almost all cases the courts in so declaring have placed the declaration upon some particular constitutional section. This has led to two unwarranted results: One, in the erroneous pronouncement casually made in some opinions that unless decision can be brought under some specific and express section there is no inhibition; and, the other, in the consequent straining of some section to make it cover the case, when in fact it is not true that in every case the court must be able to find some specific inhibition which has been disregarded. Cooley's Const. Lim. (8th Ed.), 355 et seq.; 6 R. C. L., page 105. "Necessarily in all Constitutions or other instruments there are certain propositions which the instruments import,

as well as those which they expressly and in terms assert.'' Hopper v. Britt, 203 N. Y. 144, 96 N. E. 371, 372, 37 L. R. A. (N. S.) 825, Ann. Cas. 1913B, 172; Lexington v. Thompson, 113 Ky. 540, 68 S. W. 477, 57 L. R. A. 775, 101 Am. St. Rep. 361.

In view of the foregoing observations, it is our purpose to go back to that of which Constitutions are made. We would attempt to begin our inquiry with what lies at the bottom of the question, and to proceed only in that manner which will keep our feet throughout on those foundations. It is an indisputable truth that no earthly structure can exist without resting upon natural foundations—as for instance a house upon its sills, and these in some manner at last upon the ground. And thus it is that the Constitutions, state and federal, are not suspended in the air like Mohammed's coffin, but they rest upon the unchanging and unchangeable laws of nature, and upon those fundamental and indispensable principles of civil and political right without which no constitution in a civilization such as ours could permanently exist, whatever its particular provisions might be. Let us suppose that to conserve resources, the Legislature should enact that freezing weather shall be unlawful in this state, or to prevent floods, that the waters shall at certain seasons flow backward. These are things that, of course, are beyond mortal power, are controlled by the laws of nature, and as such are at the foundations of Constitutions. Blackstone says: ''This law of nature, being coeval with mankind and dictated by God Himself, is, of course, superior in obligation to any other. It is binding over all the globe in all countries and at all times: No human laws are of any validity if contrary to this; and such of them as are valid derive all their force, and all their authority mediately or immediately from the original.'' This unimpeachable assertion is concentrated into the ancient maxim of the law, jura naturae sunt immutabilia, and are paramount or

leges legum.   Anderson v. Wilkins, 142 N. C. 154, 55 S.
E. 272, 9 L. R. A. (N. S.) 1145, 1148; Co. Lit., section 212.

This fundamental proposition that the laws of nature
are of higher authority than any human enactment, and
that therefore constitutional laws, are inseparable there-
from, is as we take it, so completely self-evident that it
can hardly be conceived as possible that normal minds
can differ upon it.  And in this day and time, it is none
the less evident that the rights and securities founded
upon the immutable and unyielding law of nature are
equally within that higher authority.  This, indeed, was
the principle upon which our colonial forefathers based
their fervid petitions to an arbitrary government, and
upon which they appealed to arms in a successful revolu-
tion.   It was the dominant and abiding principle which
they had determined to preserve and did preserve in the
institution by them of constitutional government in this
country, and which under those Constitutions it is the
inescapable duty of courts to continue to preserve and
to transmit unimpaired to future generations.   It is this
fundamental proposition, exactly, upon which we plant
our feet in this case, and in standing upon it, we have
the support of that supreme authority which existed
before there were books in the libraries.

On the contrary, when we speak herein of immutable,
unchangeable laws, we try to make it clear that we have
no direct reference to laws that have been made by hu-
man authority; and more particularly do we reject any
suggestion that there shall be any necessity that this
quality of unchangeableness shall have been uniformly
recognized on any given question by the enactments and
practices of the long dead past.   For, if we turn back
very far beyond the time of the migration of our an-
cestors to this New World, delve into the pages of an-
cient legal history, we will find that at one time or another
there has been recognized and enforced every conceivable
absurdity that barbarism could suggest or superstition

would demand. Human laws have run the entire course from that tyrannical governmental conception that all power is by divine right vested in the king—even to the power of life and death upon a mere fiat, without actual offense or a hearing in respect thereto—on back to that primitive conception of the law of the feud under which the individual was a law unto himself and could, without legal restraint, enforce the private right of revenge, taking the life of one who has killed or injured a member of his family, or if not able to find the killer, then to take as a satisfaction the life of any other person in the community who might happen to be accidentally met. To use the words of a great American patriot, the rights of which we speak here "are not to be rummaged for among old parchments or musty records. They are written, as with a sunbeam, in the whole volume of human nature by the Hand of Divinity itself, and can never be erased or obscured by mortal power."

Under all sound modern conceptions, the affliction of insanity, so that a person is totally insane, is a visitation of Providence and is at the hand of God. The overwhelming and presently uncontrollable result of that visitation is such as to deprive the sufferer of the power of responsible reason, and this result, so long as the affliction lasts, is one pronounced by the decree of nature itself. And when, and so long as, deprived of the faculty of reason, the afflicted person is no more than a frame of bones and muscles, although in a physical sense he is still living and subject to the sensation of pain, and other feelings of a purely physical character. In the light of nature and nature's laws, such a person is then no more capable of committing a crime than a five year old child, or an idiot, or the insensate animal of the brute creation, and no more so than would a dead body found naked on the street be indictable for an indecent exposure. Then how can a legislative enactment, which runs counter to these determinative and overruling dis-

pensations and ordinances of nature, be valid, and how can a Legislature make by its fiat a fact out of something which nature declares by its paramount power is not a fact—how can a Legislature change into guilt that which under the supreme law of nature is not guilt, or punish as a crime, that which nature proclaims is not a crime? This man-made statute would attempt by an arbitrary legislative declaration to insert into the equation the essential elements of volition, animus and intent, and thereby to make of a homicide by a lunatic a felonious crime, when nature, under the dictates of the Supreme Ruler of the Universe, has removed those elements in the particular case and has made it impossible for human power to insert them—has thereby made any such legislative fiat a nugatory pronouncement—void because contrary to the immutable and paramount laws of nature.

But if upon the proposition as stated in the foregoing paragraph, there could still be any difference of opinion as to the effect of the handiwork of nature in the solution of the problem, let us then place its consideration upon the proposition that insanity is a disease, and is a disease wherein the volition of the sufferer has had no responsible part in the existence of the affliction, or if any part, then one so remote that volition must disappear as a feature in the equation. Certainly, we must all agree that insanity as a disease is a work produced through the processes of nature, is thus a visitation of Providence, and is at the hand of God. But the existence of insanity is detrimental to the public welfare, to the public safety, and particularly to the public health. Suppose then that the Legislature, in the purported exercise of the police power of the state, for the promotion of the public welfare, the public safety, and of the public health, should enact a statute making it a crime for a person to be afflicted with the disease of insanity. The disease of tuberculosis is a greater curse upon the human race than

insanity, and moreover is communicable. Suppose the Legislature should pass a law making the disease of tuberculosis punishable as a crime, or should enact that if any tubercular person should communicate the disease to a nurse or a member of his family and the latter die of it, the person so transmitting the disease shall be guilty of murder, regardless of any and all other circumstances. And when an insane person commits a homicide, he does no more than transmit, as one of the results of his affliction, a death-dealing but nevertheless irresponsible manifestation of that baneful disorder. It is the disease that has done it, and diseases which are the sole work of nature cannot be punished as a crime, no more than could epilepsy or blindness or curvature of the spine be denounced as penal offenses. The field of operation of the legislative power upon the diseased is amelioration and segregation, not condemnation.

We understand, of course, the worthy purpose of the Legislature in the enactment of this statute. We are conscious of the shameful abuses in the practical administration of criminal justice which have been perpetrated by means of this defense of insanity. But there have been even more abuses in the perjured pretenses of the alibi, and the latter defense is the easier to make than that of insanity. There is therefore the greater reason, from the standpoint of the elimination of fraudulent defenses, for withdrawing the alibi as a defense than there is for that of insanity. Suppose, then, that the Legislature should enact a statute that the defense of an alibi shall no longer be admitted, just as they have here enacted that the fact of insanity shall not be admitted as a defense. We would then have the situation that so long as one witness testified that the person indicted was there present and committed the homicide, this asserted fact should be conclusive and indisputable, although a hundred other witnesses stand ready to testify to the overwhelming fact that the person charged was,.

at the very hour and minute of the homicide, chained hands and feet in a distant part of the country, guarded day and night, by every one and all of these one hundred witnesses. What else in fundamental principle would we have there than simply a legislative fiat, contrary to that immutable law of nature that no one individual can be at two widely separated places at one and the same time?

Let us advance the inquiry a step further. Where one guilty person has escaped the law on the pretense of insanity, twenty-five have defeated justice on the false and perjured plea of self-defense. Suppose then the Legislature should enact that the plea of self-defense shall no longer be received in any court and that the same shall be and is abolished. This would be equivalent to a legislative pronouncement that a man must suffer himself to be killed by another, shall give up his own life, rather than raise his hand to defend himself, and that if he do so he shall be guilty of a crime, and, further, if the necessity of his defense be such that his assailant be killed, the killing shall be murder, and all this regardless of the circumstances. The right of self-defense is inherent in the very nature of man. It is an instinctive and ineradicable part of him. He has claimed and enforced the right in all ages of the past, and will continue to do so in all coming ages, regardless of man-made laws. What is true of man in this respect is true of the beasts of the field and of the birds of the air. This right of self-defense is the universal law of all animate nature, and is unchangeable; wherefore any law that would undertake to abolish it would be no law—it would be overruled by the superior, immutable, and all pervading law of nature.

Advancing the proposition still further, let us suppose that the Legislature should enact a statute abolishing the relation of husband and wife, and of parent and child, and should prohibit marriage and attempt to de-

stroy the family as an institution in civil government, and then counsel would come into court demanding that some specific section of the constitution be pointed out as expressly inhibiting such legislation. The answer would be that such an enactment, as we have already mentioned, would be contrary to these fundamental and essential principles of civil rights which no Constitution in a civilization such as ours could permanently exist. What would be the good of a Constitution, and how long would it last, if the foundations of the family and the family relationship be struck from under that constitution? Our very civilization would crumble, involving everything, including the Constitution, in a barbarous and indiscriminate ruin.

And it is no answer to all we have said, to reply that we put impossible examples, cases which no Legislature would ever attempt, for, to that, there would be the rejoinder that, in the minds of many worthy and patriotic people, it would, before this particular legislation on insanity was passed, have been thought equally impossible that such an act as this could ever have been seriously proposed.

But we do not have to look, in this case, to the fundamentals of indispensable civil rights. It is enough that the legislation runs into conflict with the fundamental and paramount laws of nature. And with that latter as the premise, then there is no necessity that any particular section of the Constitution shall be advanced into view. Nevertheless, if there be such a necessity, then it would seem to be clear enough, upon the premise which we have herein maintained, that the act is in contravention of section 14 of the Constitution, the section on due process, because being contrary to paramount inhibitions or leges legum, the statute is by the same reason contrary to the fundamental law of the land, and would deprive the accused of the benefit of that law; would withdraw from the jury an essential fact inher-

ently pertinent and vitally material; would outlaw this particular class of defendants at the very threshold of their trials.

Section 14 is elaborated upon by another concurring opinion, with which we agree so far as that section is concerned. But even if section 14 did not apply, there yet is section 32 of our Constitution, which stands as the concluding section of the bill of rights. It reads: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." Useless or meaningless sections were not inserted in our Constitution, nor was this section ordained to make a flourish of language. Its purpose and language are clear. The bill of rights, as well as other parts of the Constitution, contain limitations on legislative, judicial, and executive power. The makers of the Constitution were not willing to stand alone on these express limitations. By section 32 of the Constitution they said, in broad and unmistakable terms, that those express limitations on the powers, legislative, executive, and judicial, to deny or impair the rights of the people, are not all or the only limitations on such powers; that in addition to all those other limitations, there shall be the further and plenary limitation that none of these departments shall deny or impair other rights inherent in, and retained by the people. Is it not true that a right implanted in man, or a defense secured to him by the operation of nature and of nature's law, is an inherent right? To ask that question is to answer it. Whence it follows that although different minds might differ as to other sections and their particular meaning and applicability, so that if it could be said that other specific sections do not apply, there stands at last this section 32 as a final barrier to all such legislation, or the exercise of other governmental powers, as would deny inherent, immutable, indispensable, para-

mount rights, or would destroy the securities of such rights.

We concur, therefore, in the conclusion that the said statute is void, and that the judgment of the court, pronounced in obedience to it, is without constitutional support. Judge ANDERSON joins in the foregoing concurring opinion, and we are directed to add that Judge ETHRIDGE thinks section 32 of the Constitution prohibits the enactment of the statute, even were no other section of the Constitution violated.

**Smith, C. J.**, delivered a dissenting opinion.

A state legislature possesses all the state's legislative power except such as has been delegated to Congress, or is expressly or impliedly withheld from it by the state or federal constitutions, and "the only test of the validity of an act regularly passed by a state Legislature is whether or not it violates the limitation imposed by the state or federal Constitution in express terms or by clear implication." 12 C. J. 749. This limitation must be found in some particular section of the Constitution. Rohrbacher v. Mayor and Aldermen, City of Jackson, 51 Miss. at page 745; Johnson v. Reeves & Co., 112 Miss. 227, 72 So. 925. For the courts have not the right to refuse to enforce statutes merely because "they are unjust and repugnant to the general principles of justice, liberty, or rights not expressed in constitutional provisions;" violate the spirit supposed by the judges to pervade the Constitution; are against public policy or are unwise and impolitic. 12 C. J. 754 et seq.; 6 R. C. L. 104; 1 Cooley's Const. Lim. (8 Ed.) 341; State v. Henry, 87 Miss. 125, 40 So. 152, 5 L. R. A. (N. S.) 340; and State v. Edwards, 93 Miss. 704, 46 So. 964.

The constitutional provisions which counsel for the appellant claim are here violated, are the guaranty of trial by jury and the prohibitions against the depriva-

tion of life, liberty, or property without due process of law, and against the infliction of cruel and unusual punishment.

The statute is said to violate the constitutional guaranty of trial by jury in two particulars: First, it requires the court to try a defendant charged with murder, although he may then be insane; and, second, it withdraws from the jury the determination of an essential element of the crime of murder, that is, the sanity of the defendant at the time of the homicide. The section of the Constitution here invoked is 26, which provides: "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, . . . and, in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed."

The trial on a criminal charge of a person then so insane as to be unable to conduct his own defense or advise with his counsel relative thereto, or to be confronted, in the legal sense, with the witnesses against him, probably, and I will assume, would violate this section of the Constitution. But this statute does not expressly require a defendant to be tried while insane, and should not be held to do so by implication, unless the implication is clear and imperative. If the statute can be construed so as not to violate the Constitution, it is the duty of the court to do so, resolving all doubts in favor of a construction thereof that is in accord with the Constitution. State v. Wheatley, 113 Miss. 555, 74 So. 427, 428; Miller v. State, 130 Miss. 564, 94 So. 706; Staple Cotton Co-operative Association v. Hemphill, 142 Miss. 298, 107 So. 24; Robinson v. State, 143 Miss. 247, 108 So. 903; Shilling v. State, 143 Miss. 709, 109 So. 737; State v. Miller, 144 Miss. 614, 109 So. 900; Thompson v. Box, 147

Miss. 1, 112 So. 597; Darnell v. Johnson, 109 Miss. 570, 68 So. 780; University of Miss. v. Waugh, 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588, Ann. Cas. 1916E, 522.

This implication is said to arise under section 2 of the statute, because of the requirement that "the trial judge may, in his discretion, certify to the governor that in his opinion the mental condition of the prisoner is such that he should not be confined in the penitentiary, in which event" he shall be placed in the institution for the care of the insane. This provision of the statute, it is said, contemplates the trial of persons then insane, for the reason that it authorizes the trial judge to certify to the governor immediately after conviction that the convict is then insane. I do not think the implication arises. In determining whether a defendant's mental condition is such that he should not be put on trial, the court has no concern with insanity at a prior period except in so far as it bears on his then mental condition. Moreover, the test of mentality sufficient to justify putting a defendant on trial and that by which his responsibility for crime is determined, are different. The implication, to say the most, is vague, and its existence debatable.

Coming now to the second objection to the statute under this section of the Constitution: It will be observed that the effect of the statute is to amend the definition of murder, so as to exclude therefrom the element of sanity. For instance, under section 985, Code 1930, the killing of a human being, without the authority of law, by any means, and in any manner, is murder when done with deliberate design to effect the death of the person killed, or of any human being. To this definition of murder the common law, unless otherwise provided by statute, adds the following—"and with knowledge and appreciation of the nature and quality of the act done."

The Legislature has full power to declare and define crime, and in so doing may exclude elements which theretofore, under the common law, had entered into an inquiry as to its commission. The guaranty of trial by jury requires that all questions of fact that enter into the judgment to be rendered shall be determined by a jury, but has no bearing on the power of the Legislature to amend the common-law definition of a crime so as to exclude therefrom elements included therein at common law. "The common law, as a portion of the law of the land, is recognized by the Constitution of this state, but is subject to be altered or repealed at the will of the Legislature." Noonan v. State, 1 Smedes & M. 562.

The due process of law clauses of the federal and state constitutions protect the citizen from the arbitrary exercise of legislative power; and the test of the validity of a statute thereunder is "whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat. . . . And unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the Legislature,—a notion foreign to our constitutional system." Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 S. Ct. 44, 47, 57 L. Ed. 184; Hebe Co. v. Shaw, 248 U. S. 297, 39 S. Ct. 125, 63 L. Ed. 255; Ruppert v. Caffey, 251 U. S. 264, 40 S. Ct. 141, 64 L. Ed. 260.

If men may reasonably differ as to whether or not a statute bears a "substantial relation to a proper purpose," or, in the language of the United States Supreme Court, "if it be debatable, the Legislature is entitled to its own judgment, and that judgment is not to be superseded" by the personal opinions of judges "upon the issue which the Legislature has decided "

Hebe Co. v. Shaw, supra, 248 U. S. 297, 39 S. Ct. 125, 63 L. Ed. at page 259, and Price v. Illinois, 238 U. S. 446, 35 S. Ct. 892, 894, 59 L. Ed. 1400.

The Legislature probably had in mind two purposes in enacting this statute: First, to render more effective the law against homicide by rejecting the defense of insanity as a cloak for crime, which defense the Legislature could very reasonably, in the light of our judicial history, believe to be manufactured in many instances, and that, as Justice WILBUR of the supreme court of California is quoted as having recently said: "Most pleas of insanity are made by sane people, who frequently go free, while most insane criminals make no insanity plea and are duly convicted and sentenced." Crime, Abnormal Minds and the Law—Hoag. And, second, to conserve the peace and safety of the people by confining a person who has taken human life while insane and may again do so. Both of these purposes are, beyond doubt, proper, and that the provisions of the statute have a substantial relation thereto seems clear. To say the least, they are debatable, and therefore "the Legislature is entitled to its judgment" in the matter. Much of what I shall hereafter say relative to the alleged conflict of the statute with the cruel and unusual punishment provision of the Constitution applies to the second beforementioned purpose of the Legislature in enacting the statute, and should be considered herewith.

The ground on which, at common law, as interpreted by this court, an insane person is relieved of punishment for an otherwise criminal act, is that because of his insanity he was unable to know and appreciate the nature and quality of his act; insanity short of this is no defense. Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A. (N. S.) 461, Ann. Cas. 1912A, 23. There are many statutes, both state and national, particularly such as prohibit the sale of certain articles, by which

knowledge is excluded from any inquiry into offenses committed under them.

In Chicago, B. & Q. R. Co. v. U. S., 220 U. S. 559, 31 S. Ct. 612, 617, 55 L. Ed. 582, it is said that: ''The power of the Legislature to declare an offense, and to exclude the elements of knowledge . . . from any inquiry as to its commission, cannot, we think, be questioned,'' citing numerous anthorities, among which is Halsted v. State, 41 N. J. Law, 552, 32 Am. Rep. 247; from which the following was quoted with approval: ''As there is an undoubted competency in the lawmaker to declare an act criminal, irrespective of the knowledge or motive of the doer of such act, there can be, of necessity, no judicial authority having the power to require, in the enforcement of the law, such knowledge or motive to be shown. In such instances the entire function of the court is to find out the intention of the Legislature, and to enforce the law in absolute conformity to such intention.''

The fear that a person who is totally deprived of reason and ''is no more than a frame of bones and muscles'' will be punished under this statute—I speak with deference—is without sufficient foundation in the statute to constitute a reason for declining to enforce it. A person without mentality sufficient to control his movements, rarely, if ever, kills, unless accidentally; and such persons ''are practically never the objects of medico-legal inquiry.'' 1 Wharton and Stilles' Medical Jurisprudence (5 Ed.) 524; Erskine's Defense of Hadfield. Moreover, a person totally deprived of reason because of insanity rarely, if ever, recovers, and therefore could never be tried, under the rule which prohibits the court from trying a defendant when he is insane.

Theoretically, the statute may appear harsh, but the validity of a statute, under the due process clause of the Constitution, should be determined, not by its theoretical, but by its practical operation and effect. Compare Ex

parte Kemmler, 136 U. S. 436, 10 S. Ct. 930, 34 L. Ed. 519.

"Insanity," that is, inability to know and appreciate the nature and quality of an act because of a mental defect, as a defense for the commission of crime, has been so long a part of the common law, and has become so firmly imbedded in the legal and judicial mind, that it has come to be regarded as one of the rights of the individual of which the state should not deprive him. I appreciate the force of this objection, but I think reasonable men may differ thereon.

The provisions of the second section of the statute for the confinement of a convict under it in the state insane hospital until he recovers his sanity, if then insane, is said to deprive him of due process of law, in that he is given no hearing thereon. If the Legislature has the power under the due process clause of the Constitution to exclude insanity as a defense to crime, it necessarily follows that it has the power to provide for the imprisonment of a person convicted, notwithstanding his insanity; and the placing of such a person in an insane hospital instead of an ordinary prison during the period after his conviction that he may continue insane cannot be claimed as a right, but as an act of grace, and therefore he cannot complain if he is not heard thereon.

Section 28 of the Constitution provides that, "Cruel or unusual punishment shall not be inflicted." This provision of the Constitution has never been construed by this court. In Ex parte McInnis, 98 Miss. 773, 54 So. 260, and Thomas v. Yazoo City, 95 Miss. 395, 48 So. 821, 1041, statutes there under consideration were said not to violate it without any discussion of the section. In State v. Longino, 109 Miss. 125, 67 So. 902, Ann. Cas. 1916E, 371, the appellant was charged with the doing of an act which this court had said in State v. Traylor, 100 Miss. 544, 56 So. 521, did not come within the pro-

hibition of section 1169, Code 1906. Afterwards, and before that case was overruled by State v. Rawles, 103 Miss. 806, 60 So. 782, the appellant committed the act which was said in the Traylor case not to be within the prohibition of the statute. In reversing the appellant's conviction and holding that the decision in the Rawles case should not operate retroactively but only prospectively, the court gave as one of its reasons for so holding "that the punishment of an act declared by the highest court of the state to be innocent, because the same court had seen fit to reverse its interpretation of a statute, would be the very refinement of cruelty; it is certainly unusual because no precedent can be found for its infliction; that it is unjust is perfectly obvious." The decision was not placed on the cruel and unusual punishment section of the Constitution, and the court did not say that the appellant would be protected thereby. What was there said in this connection was to reinforce the court's conclusion that its decision in the Rawles case should operate prospectively only.

This section of the Constitution was taken from the Federal Constitution, where it appears in Amendment 8, and that Amendment was taken from the bill of rights in the historic English statute passed at the beginning of the reign of William and Mary, entitled "An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown," which, after enumerating many acts of tyranny by the Stuart Kings, among which were the requiring of excessive bail, imposing excessive fines, and inflicting illegal and cruel punishments, declared that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments, inflicted. All these prohibitions will be found, in haec verba, in the Eighth Amendment to the Federal Constitution, and in sections 28 and 29 of our state Constitution. Having adopted the very words in which these prohibitions are couched in the English

statute, the framers of our Constitutions, under a well-recognized rule for construing Constitutions and statutes, should be held to have intended for them to serve the same purpose they were intended to serve in the English statute. What, then, did these words mean in that statute? A complete and historically accurate answer to this question will be found set forth and buttressed by authorities in the separate opinion of Chief Justice White, concurred in by Justice Holmes, in Weems, v. United States, 217 U. S. at page 390, 30 S. Ct. 544, 558, 54 L. Ed. at page 808, 19 Ann. Cas. at page 717:

"Whatever may be the difficulty, if any, in fixing the meaning of the prohibition at its origin, it may not be doubted, and indeed is not questioned by anyone, that the cruel punishments against which the bill of rights provided were the atrocious, sanguinary, and inhuman punishments which had been inflicted in the past upon the persons of criminals. This being certain, the difficulty of interpretation, if any, is involved in determining what was intended by the unusual punishments referred to and which were provided against. Light, however, on this, subject, is at once afforded by observing that the unusual punishments provided against were responsive to and obviously considered to be the illegal punishments complained of. These complaints were, first, that customary modes of bodily punishments, such as whipping and the pillory, had, under the exercise of judicial discretion, been applied to so unusual a degree as to cause them to be illegal; and, second, that in some cases an authority to sentence to perpetual imprisonment had been exerted under the assumption that power to do so resulted from the existence of judicial discretion to sentence to imprisonment, when it was unusual, and therefore illegal, to inflict life imprisonment in the absence of express legislative authority. In other words, the prohibitions, although conjunctively stated, were real-

ly disjunctive, and embraced as follows: (a) Prohibitions against a resort to the inhuman bodily punishments of the past; (b) or, where certain bodily punishments were customary, a prohibition against their infliction to such an extent as to be unusual and consequently illegal; (c) or the infliction, under the assumption of the exercise of judicial discretion, of unusual punishments not bodily, which could not be imposed except by express statute, or which were wholly beyond the jurisdiction of the court to impose." See also Watson on Constitution, page 1510.

But I will concede, merely for the purpose of the argument, "that the cruel and unusual punishment clause does not merely limit the legislative power to fix the punishment for crime by excepting out of that authority the right to impose bodily punishments of a cruel kind, in the strict acceptation of those terms, but limits the legislative discretion (as is here claimed not only) in determining to what degree of severity an appropriate and usual mode of punishment may, in a particular case, be inflicted;" but also whether any punishment at all may, in a particular case, be inflicted, "thereby endowing the courts with the power to refuse to enforce laws punishing crime, if, in the judicial judgment, the legislative branch of the government has prescribed (either) a too severe punishment," or punishment when none should be inflicted.

We must not here be led astray by the use of the word "punishment," but must bear in mind that one purpose for the imprisonment of a person who has killed another while insane is to conserve the peace and safety of those with whom he would otherwise come in contact. The question therefore is: Is it cruel, in the constitutional sense, to imprison a person who has taken human life while insane?

The right of the state to confine persons whose mentality is such as to render them dangerous to the peace

and safety of its people, or who, because of mental defects, have committed and may again commit acts dangerous to the peace and safety of the people, is not only undoubted, but is one of the state's duties, which practically all civilized governments seek in some way to discharge. The imprisonment here provided for, therefore, is neither cruel nor unusual unless made so by the nature and place of imprisonment and the fact that it continues though the insanity disappears.

Whether the place of confinement is designated as an institution, a hospital, or a prison, would seem to be unimportant, for by whatever name called it remains a prison, and is intended to be such for those confined there. And the mere fact that the criminal insane are confined in a prison instead of an ordinary institution for the insane cannot, in reason, be said to be cruel. Ex parte Brown, 39 Wash. 160, 81 Pac. 552, 109 Am. St. Rep. 868, 4 Ann. Cas. 488, 1 L. R. A. (N. S.) 540, and note thereto. The relative security of the two places would seem to require the prison instead of an ordinary institution for the insane.

But it is said that imprisonment for crime carries with it a stigma that renders its infliction cruel in the case of persons who were insane when the crime was committed. If this be conceded, the Constitution would not be violated. But no such stigma could here result, for the verdict of the jury establishes the insanity at the time of the commission of the crime, and therefore the absence of moral guilt.

Again, it may be said that while in prison the convict is subject to prison discipline, a part of which is that he shall engage in manual labor. I take it for granted that this labor will be of a humane character, as under the Constitution it must, and if it is, the convict is better off than he would be if idle, and, I dare say, he would not be permitted to remain wholly idle in a properly conducted institution for the insane, unless too insane for work of any kind.

Does the requirement of the statute that a person convicted under it shall be imprisoned without inquiry into, and without reference to, his sanity at the time of imprisonment, render the statute void? In other words, is it cruel within the meaning of the statute to imprison a sane man who has killed another while insane? I think it safe to say that our knowledge of insanity, of its cause, effect, treatment, and cure, are yet imperfect, and that the probability never entirely disappears of a relapse into insanity by one who has once been insane. If this is true, can it be said to be cruel to provide effectually against such a contingency in the case of one who has taken human life while insane, and may do so again?

The omission from statutes providing for the imprisonment of an insane person under a verdict of guilty but insane, of a provision for a discharge as a matter of right on the recovery of his sanity, is not infrequent, as will appear from the note to Ex parte Brown, supra. In Georgia, a special act of the Legislature is necessary therefor; in Massachusetts such a convict on the recovery of his sanity may be discharged by the governor with the advice and consent of the council; in England, the convict is committed to prison to await the pleasure of the king.

The statute in force when the one here under consideration was enacted, provides that: "When any person shall be . . . acquitted on the ground of insanity . . . if the jury certify that such person is still insane and dangerous, the judge shall order him to be conveyed to and confined in one of the state asylums for the insane." Section 1367, Hemingway's Code 1927, section 1540, Code 1906. This statute does not provide for the discharge of a person committed to an asylum under it on recovery of his sanity. In Caffey v. State, 78 Miss. 645, 29 So. 396, this court held that an appeal would not lie from such an order of commitment, but has not yet decided whether a person so committed is entitled to be released on recovery of his sanity.

There is one other matter that is not without value here. At common law, as interpreted by the courts of eleven of our sister states, "although there may have been a capacity to distinguish between right and wrong as to the particular act, still the party is not responsible if the jury find that by reason of mental disease he had so far lost the power to choose between right and wrong as not to be able to avoid doing the act, so that his free agency was at the time destroyed." This rule has been repudiated by this court, and the test of responsibility on the ground of insanity has been limited "to the capacity to distinguish between right and wrong, so that an irresistible impulse, even though it is claimed to have been an insane impulse, does not exempt one from responsibility for crime, where his mental capacity was such that he had a knowledge of right and wrong as to the particular act." It would seem to be just as cruel to punish a man for the doing of that which he was unable to resist, because of the duress of insanity, as to punish him for doing that which he could have refrained from doing, but did not know that it was wrong to do.

The statutes of several of the states provide for the sterilization of criminals and mental defectives. These statutes are held not to violate this section of the Constitution. Smith v. Wayne Probate Judge, 231 Mich. 409, 204 N. W. 140, 40 A. L. R. 515; Buck v. Bell, 143 Va. 310, 130 S. E. 516, 51 A. L. R. 855; Buck v. Bell, 274 U. S. 200, 47 S. Ct. 584, 71 L. Ed. 1000. When compared with those statutes, and remembering the purpose it was intended to accomplish, the statute here under consideration would seem also not to be cruel in the constitutional sense.

The cruelty of this statute, if such there is, fades into insignificance when compared with the cruelty which the law permits to be inflicted on insane criminals who do not come within the provisions of this statute. As here-

inbefore said, insanity, other than such as prevents one from knowing and appreciating the nature and quality of an act committed, is no defense to crime. This test of the responsibility of an insane person is so narrow as to permit the punishment of, even the infliction of the death penalty on, persons who are so insane as to be morally irresponsible for their acts; and is founded on long obsolete medical views of mental disease. It is derived from the opinion of the judges to the House of Lords in 1843 in McNaughten's case, of which the Supreme Court of New Hampshire said: "It is probable that no ingenuous student of the law ever read it for the first time without being shocked by its exquisite inhumanity." State v. Jones, 50 N. H. 369, 9 Am. Rep. 242. Mr. Bishop was fully justified in saying "the memorials of our jurisprudence are written all over with cases in which those who are now understood to have been insane have been executed as criminals." 1 Bish. New Crim. Law (8 Ed.), section 390.

We have swallowed the camel, why strain out the gnat?

Though counsel for the appellant make no such contention, some of my brethren are of the opinion that this statute violates section 32 of the Constitution, which provides that: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people."

This section, or one similar thereto, appears in most of the state constitutions, but I have been unable to find any discussion of it by any court, and, in so far as my research discloses, no statute has heretofore been brought by any court within its condemnation. The rights reserved by it to the people are rights not enumerated or set forth in other sections of the Constitution. The inquiry then is: First, what is the right claimed by the appellant? Second, is it included in the enumeration of rights in the Constitution? And if not, then third, is it a right that is inherent in the people?

As I understand the argument in this connection, it is that one has a natural and inherent right not to be held accountable for a crime committed while insane. If by this is meant a right not to be imprisoned for the commission of a crime while insane, then the right claimed is nothing more than the right to personal liberty, which right is "enumerated" in, and protected as fully as the Constitution intends by, section 14 thereof, which provides that: "No person shall be deprived of life, liberty, or property except by due process of law." This section authorizes the restraint of liberty, provided only it is restrained by due process of law. I have discussed this section elsewhere, but will pause here long enough to say that under the American form and conception of government, no one has any right that is superior to the general welfare, to which even life must yield, as evidenced by our death penalty statutes, the validity of which is undoubted.

But if it be said that the right here claimed is more than the right to freedom from restraint of the person, and is the right not to be declared a criminal for the commission of an act while insane and imprisoned as such, that the designation of an act committed by an insane person carries with it a stigma to which the state has no right to subject him; no such stigma results from a verdict of "guilty but insane," for by it the convict is absolved of all moral guilt. In determining whether an insane person should be imprisoned for the commission of an act while insane, the term by which the act is designated is of no consequence, for the only material consideration there is: Does the commission of the act demonstrate that because of his insanity he is, and unless confined will probably continue to be, a menace to society.

In one of the reports of the American Institute of Criminal Law and Criminology, published in volume 10 of the Journal of the Institute at page 186, it is said: "As a

defense for crime, the irresponsibility of the criminal is, from the viewpoint of society, largely an academic question. The pragmatic feature of such a situation is that the offense has been committed and this remains a fact regardless of whether it is decided that the person committing it was irresponsible by reason of . . . insanity. . . . Society needs as much protection from the criminal acts of irresponsible individuals . . . as in the case of the responsible. Upon the above considerations this committee recommends the adoption of a program for development directed towards the following ends: (1) That in all cases of felony or misdemeanor punishable by a prison sentence the question of responsibility be not submitted to the jury, which will thus be called upon to determine only that the offense was committed by the defendant. (2) That the disposition and treatment (including punishment) of all such misdemeanants and felons, i. e., the sentence imposed, be based upon a study of the individual offender by properly qualified and impartial experts co-operating with the courts,'' etc. This report was approved by some of America's foremost criminologists high in the ranks of their respective professions of the law, medicine, and alienism, who evidently thought that no wrong was done an insane person by designating an act for which he is imprisoned for committing while insane as a felony or misdemeanor. As A. Moresby White, formerly of the English Bar, of which he was a distinguished member, but now of Los Angeles, California, recently said:

"No stigma attaches to a person who is found to have committed a criminal act and to have been insane at the time. 'Poor fellow' one says, 'he needs to be taken care of.' The mere finding of guilty or not guilty in such special cases would not create in the public mind any sense of shame about the accused, nor will it bring any disgrace upon him.

"Moreover we must remember that always first comes the public welfare and the public safety. Second comes the care for the innocent victim of the criminal act. Lastly should we deal with the accused party, but his interests ought not to be considered in preference to these other paramount securities of freedom." Journal of Criminal Law and Criminology, vol. 18, p. 174.

Finally it is said, not by counsel, but by some of my brethren, that the statute violates the equal protection of the laws provision of the Fourteenth Amendment to the Federal Constitution, in that it discriminates between the sane and insane by requiring the insane to be convicted and punished for murder on evidence that would require the conviction of a sane person of manslaughter only. Even if the statute should be construed as to so discriminate between the sane and insane, I doubt its conflict with the Constitution. But I am at a loss to see how it is reasonably susceptible of any such construction. Its provisions have no application where the accused is tried on an indictment for manslaughter, its express language being: "The insanity of the defendant at the time of the commission of the crime shall not be a defense against indictments for murder;" and the courts shall so instruct the jury in trials for murder; and the verdict to be rendered is not "guilty but insane," but "guilty as charged in the indictment but insane," i. e., guilty of murder but insane.

But an indictment for murder includes, generally, a charge of manslaughter, and if the evidence discloses that the homicide was not murder, but manslaughter, the jury can so find. Does the statute preclude the jury from finding an insane defendant, tried on an indictment for murder, guilty of manslaughter when the evidence discloses that such was the crime committed?

The statute is susceptible, in this connection, of only two reasonable constructions: First, it deals only with the crime of murder, and when the evidence negatives the

commission of that crime, it leaves the question of guilt, vel non, of manslaughter to be determined by the law covering the commission of that crime. This would seem to be the proper construction of the statute, for it harmonizes it with the law of manslaughter which governs in trials on indictments for that crime. The Legislature could hardly have intended for insanity not to be a defense to the crime of manslaughter in trials on indictments for murder when it left that defense in full force and effect in trials on indictments for manslaughter. Moreover, statutes dealing with subjects covered by the common law are not to be understood as effecting any change therein beyond what is expressed or necessarily implied. Second, the statute expressly provides that "in trials for murder . . . evidence tending to prove the insanity of the defendant at the time of the commission of the offense may be offered by the defendant in mitigation of the crime," and further provides for the infliction of life imprisonment in the penitentiary only on a conviction of murder. The word "mitigate" means to reduce, and "mitigation" means reduction, so that the evidence of insanity permitted by the statute to be introduced in a trial for murder, may be for the purpose of reducing the crime to a lower grade, to-wit, manslaughter; the other elements of manslaughter being present, insanity would eliminate the element of malice, thereby reducing the crime from murder to manslaughter. The statute is certainly susceptible of such a construction, and without it, and on the face of the statute, the words "in mitigation of the crime" seem meaningless. The Legislature may have thought, as the fact probably is, that a homicide committed by an insane person under circumstances that would make the crime manslaughter if committed by one who is sane does not necessarily indicate that the person committing it is a menace to the peace and safety of society. Either of these constructions would prevent the statute from violating the equal

protection of the laws provision of the Fourteenth Amendment of the Federal Constitution; and, under the rule I have hereinbefore set out, it is the duty of the court to adopt that construction of which the statute is susceptible that is in accord with the Constitution.

In conclusion, may I say that the enactment of this statute evidences an honest and sincere desire on the part of the Legislature to deal with one of the most perplexing problems of criminal law—that of the criminal insane. But, with deference, I suggest that the statute's purpose can be accomplished in a more humane, and, at the same time, a more effective manner, as will appear from an examination of the various reports of the American Institute of Criminal Law and Criminology, particularly the report published in volume 10 of the Journal of the Society at page 184, which I respectfully commend to the consideration of the Legislature.